## McAnany's Estate.

*Decedent's estates—Intestate laws—Legitimacy—Presumption of— Evidence.*

The presumption and charity of the law are in favor of the legitimacy of every child, and whoever seeks to bastardize it must establish its illegitimacy by proof that is clear, direct, satisfactory and irrefragable.

Where an estate is claimed by sisters and nieces of a decedent and also by a person claiming as a child of his half brother, whose legitimacy is denied, there is a presumption of a marriage and legitimacy, notwithstanding such denial, which is strengthened by lapse of time, and after eighty years it cannot be overcome except by strong, direct and satisfactory proof.

Argued March 7, 1927.    Appeal No. 6, February T., 1927, by Daniel J. Collins, guardian, from decree of O. C. Luzerne County, 1921, No. 761, in the case of Estate of Edward McAnany, deceased. Before PORTER, P. J., HENDERSON, TREXLER, KELLER, LINN, GAWTHROP and CUNNINGHAM, JJ.    Affirmed.

Exceptions to adjudication.    Before HELLER, P. J. O. C.

The facts are stated in the opinion of the Superior Court.

The court dismissed the exceptions.    Daniel J. Collins, guardian, appealed.

*Error assigned,* among others, was the order of the court.

*W. A. Valentine,* and with him *Peter J. McCormick,* for appellant, cited: Wharton's Estate, 218 Pa. 296; Picken's Estate, 163 Pa. 14; Osborn v. McDonald, 159 Federal 791; Sitler v. Gehr, 105 Pa. 577; Henry on

Evidence, Sec. 279, page 249; Commonwealth T. I. & Tr. Co. v. Seltzer, 227 Pa. 410; Beale v. Kline, 183 Pa. 149; Barnes' Estate, 221 Pa. 399; McConville v. Ingham, 268 Pa. 508; Stevenson's Estate, 272 Pa. 291.

*James M. Stack,* and with him *Joseph A. Mulhern* and *Evan C. Jones,* for appellee, cited: McCausland's Estate, 213 Pa. 189; Murray's Estate, 15 Dist. 542.

OPINION BY CUNNINGHAM, J., July 8, 1927:

The question involved on this appeal taken by Daniel Collins, guardian of Catherine McAnany, a feeble-minded person and a sister of Edward McAnany, the decedent, is whether the learned president judge of the court below erred in finding that Patrick McAnany, who was born in Ireland sometime prior to August 26, 1845, and died in America in 1878, after serving as a soldier in the Civil War, was the son of John McAnany (the father of appellant's ward), and in holding that the presumption of his legitimacy had not been overcome by the evidence adduced in behalf of appellant. If the presumption of his legitimacy is entitled to prevail, notwithstanding the attack made upon it in the court below, no error was committed in distributing to Mary McAnany, the daughter and only surviving child of the said Patrick McAnany, $455.93, being one-fourth of that portion of the estate of the decedent (an admittedly legitimate son of the said John McAnany), as to which he died intestate. There is no controversy about the amount distributable to Mary McAnany if she is the niece and one of the heirs at law of the decedent.

The decedent, Edward McAnany, died July 20, 1921, in a cancer hospital at Tarrytown, in the State of New York. He disposed of the major portion of his estate by a will executed April 30, 1921, but died intestate as to approximately eighteen hundred dollars worth of his personal estate. The controversy arises over the dis-

tribution of this fund under our intestate laws and the question litigated in the court below was whether Mary McAnany was entitled to share therein by right of representation of her deceased father, Patrick Mc-Anany. If he was the legitimate son of John McAnany she is the niece of the decedent and entitled to the amount awarded her. The ancestor from whom the parties in interest trace their descent was the above mentioned John McAnany, who was born in Ireland and on August 26, 1845, was married to Elizabeth Murphy. In the early fifties John McAnany and his wife immigrated to the United States. There is no dispute about the fact that six children were born of this union, three in Ireland and three in America. When John McAnany and his wife came to America the three children they then had were left in Ireland and subsequently sent over to them, their passage being paid by an "Uncle Peter," who also later on sent over the Patrick McAnany whose legitimacy is questioned. The children born to John and Elizabeth Murphy McAnany in Ireland were James McAnany, who died without issue in 1920; Mary McAnany Tolan, who died in 1903, leaving to survive her three daughters to whom, as nieces of the decedent, distribution of their mother's share in the fund has been made; and Elizabeth Mc-Anany Dunning, also a distributee. The children born in America were Margaret McAnany Coyle, who died in 1920 without issue; Catherine McAnany, a distributee and the ward of appellant; and Edward McAnany, the decedent. Two of these six children having died without issue prior to the death of the decedent, the appellant contended that the fund for distribution should be distributed in thirds to the two surviving sisters of decedent and the nieces of his deceased sister. The court below, after considering all the evidence, found that in addition to the six children above mentioned John McAnany also had another son, known throughout his

lifetime as Patrick McAnany, but that the said Elizabeth Murphy McAnany was not his mother. As stated, this Patrick McAnany was sent to America sometime after the immigration of John and Elizabeth McAnany. There is evidence in the form of photostatic copies of affidavits on file in the Department of the Interior, Pension Bureau, Washington, D. C., duly authenticated under an Act of Congress, that Patrick McAnany served during the Civil War as a member of Company A, 73rd Regiment, Pennsylvania Infantry. In affidavits made by the said John McAnany, then about seventy years of age, under dates of December 8, 1890, and September 4, 1891, he positively states that he is the father of Patrick McAnany; that Patrick McAnany came to his house after his discharge and lived with him until his marriage to Ellen Kernan, the claimant for a pension; and that Patrick McAnany was absent from his home at the time of his death. It also appears from an affidavit made by Jane Connaghan that the only living child of Patrick and Ellen McAnany is Mary, born June 7, 1870. Aside from these records and several wills and certain legal proceedings hereinafter referred to, and aside from the testimony of decedent's attorney and physician, the evidence was necessarily hearsay, of that variety usually designated as "common reputation in a family connection as to who are members of the family" or, in other words, general report in the family proved by surviving members. Naturally the oral evidence offered and received in this case, relating as it did to events long since past, required close scrutiny and careful consideration. After weighing all the evidence the auditing judge expressed these conclusions: "That John McAnany was the father of Patrick McAnany. * * * That Elizabeth Murphy McAnany was not the mother of Patrick McAnany. Who the mother of Patrick McAnany is we do not know. She may have been a wife by a prior mar-

riage or she may not." As stated in the opinion of the court below we are dealing with events which occurred more than eighty years ago in Ireland and the witnesses are testifying more than forty-five years after the death of the alleged illegitimate son of their ancestor. The principles of law governing an investigation of this kind have been clearly defined in decided cases and particularly in Pickens's Estate, 163 Pa. 14, and Wile's Estate, 6 Pa. Superior Ct. 435. The presumption and charity of the law are in favor of the legitimacy of every child and whoever seeks to bastardize it must establish its illegitimacy by proof that is clear, direct, satisfactory and irrefragable. In Pickens's Estate the contest was similar to that now under review. There the personal estate of Samuel Pickens was claimed by descendants of first cousins against those claiming as children of Benjamin Obenstein, an alleged half brother of the decedent. It was admitted that Benjamin Obenstein and Samuel Pickens were children of the same mother. Her marriage to Pickens was established and the question was whether she had previously married Obenstein. Here there can be no reasonable doubt that Patrick McAnany and the decedent were children of the same father. The only question is whether John McAnany, the father, was married to the mother of Patrick McAnany prior to his marriage to Elizabeth Murphy. As stated by Mr. Justice Fell in the case cited: "In such an inquiry as this there is always a presumption in favor of marriage, which is strengthened by lapse of time; and after ninety years it cannot be overcome except by strong, direct and satisfactory proof." Applying further the language of our Supreme Court in the case cited to the case at bar, Mary McAnany "is not confronted with the presumption of the illegitimacy of her ancestor and not required to disprove it." It is there pointed out that in the absence of all evidence the presumption is in favor of

322 McANANY'S ESTATE.

legitimacy and after the lapse of time shown in that case such presumption "could not have been removed except by clear proof." Speaking of the common ancestor in that case the Supreme Court said: "There was no distinct evidence of a marriage to either, but presumably she was the lawful wife of each. Such a presumption is entirely consistent with the facts as established by the testimony, but if conflicting presumptions arose that in favor of innocence and legitimacy would prevail." The learned and able counsel for appellant seek to distinguish this case by pointing out that there was evidence in the Pickens case that the mother had lived with Obenstein previous to her marriage to Pickens, but that there is no evidence that John McAnany ever lived with Patrick McAnany's mother. This is true, but it is equally true that there is no evidence that he did not live with Patrick's mother previous to his marriage to Elizabeth Murphy. The presumption is as strong one way as the other and that "in favor of innocence and legitimacy" should prevail until overcome by the proper measure of proof.

We shall not attempt to review the testimony in detail as a consideration of its salient features will be sufficient to indicate where its weight lies. Mary McAnany, employed since 1907 in a clerical capacity at the Bellevue Hospital in New York, testified that she had never seen her father; that two other children now deceased were born to her father and mother and that her father had gone away from home in the October preceding her birth in June, 1870. Her testimony as a whole indicates that for more than thirty years she lived at Wilkes-Barre on terms of intimacy with the family of her father and paternal grandfather; that she visited the home of the decedent about once a month and addressed him and his brother James as "Uncle Eddie" and "Uncle Jim" and John McAnany and his wife as grandfather and grandmother. At the hearing

she produced a postal card mailed to her by Margaret
McAnany Coyle about 1912, containing Christmas
greetings and signed "Your Aunt Margaret." It is
also in evidence that she was the beneficiary under the
will of this sister of the decedent to the extent of $500.
She further testified that the decedent wrote her stating
that his physician had advised him to go to New York
for treatment and that upon her invitation he came
and remained with her several days until she could ar-
range for his treatment in the hospital in which he
died. The will of the decedent was written by his at-
torney David B. Gildea, Esq., of the Luzerne County
bar, who went to the hospital at Tarrytown for that
purpose. The second paragraph of the will reads:
"I give and devise to Mary McAnany of 201 E. 30th
St., New York City, the sum of $5,000," and she is
named as one of the executors. Mr. Gildea testified
that the decedent had told him that he was going to
New York "to his niece, Mary McAnany"; that on
several other occasions the decedent had referred to her
as his niece and that when instructions were given for
the preparation of the will the decedent said "He
would give $5,000 to Mary McAnany, that is, his
niece." One of decedent's physicians, Dr. Nealon,
testified that he advised him to go to Philadelphia or
New York for radium treatment and that the decedent
told him "He had a niece in the Bellevue Hospital"
and if he could get in touch with her he could get better
treatment. This testimony is entirely consistent with
the presumption of legitimacy and indicates a recogni-
tion by the decedent and his sister of Mary McAnany
as their niece. On the other hand the appellant points
out that in the wills of decedent and Margaret Coyle
the bequests to Mary McAnany are made to her merely
as "Mary McAnany of 201 E. 30th St., New York
City" in one instance and as "Mary McAnany of New
York" in the other, without describing her as the niece

of the respective testators; whereas, in certain other provisions of each will the testator's relationship to other beneficiaries is stated. These facts have no particular significance one way or the other, especially in view of the testimony of Mr. Gildea to the effect that, although the decedent said he wanted to give $5,000 to his niece Mary McAnany, he, the scrivener, had not used the word "niece" in drafting the will because it was understood that Mary McAnany was the decedent's niece. Then there was evidence to the effect that, in the settlement of the estate of James McAnany, of which Edward McAnany was the administrator, the name of Mary McAnany was not given at the audit as one of the heirs of James McAnany; but it appears that the names of Margaret Coyle and Elizabeth Dunning, sisters of James McAnany, were also omitted and therefore no inference can be drawn from the omission of Mary McAnany's name. This observation applies equally to the petition of Elizabeth McAnany, claiming her widow's exemption out of the estate of John McAnany, because although she omitted the name of Mary McAnany as an heir she also omitted the name of Elizabeth McAnany Dunning, her own daughter. It should also be borne in mind that the matters to which we have referred all occurred before any litigation had been instituted relative to the legitimacy of Patrick McAnany. Appellant lays stress on the testimony of Margaret Mulhern, a niece of Elizabeth Murphy McAnany, who testified to certain statements made to her by her aunt relative to Patrick McAnany. These statements were to the effect that Elizabeth Murphy was only about fifteen years of age when she was married to John McAnany, who was "a great deal older"; that after they had been married about three months Patrick McAnany was brought to her by his mother and left at her house in Ireland; that she would not accept the child and her husband's mother took it and

raised it. It is significant that there is nothing in the statement of Elizabeth Murphy McAnany, as reported by the witness, identifying the mother of the child in any way or indicating the age of the child at the time of the alleged occurrence. The testimony of Mrs. Catherine Dunn, a niece of the decedent, was substantially to the same effect except that the story as related to her by her mother varied to the extent that it was either the mother or the grandmother of the child who brought it to the McAnany door and the time had lengthened from three months after the marriage to the time when "Jim [Elizabeth Murphy McAnany's oldest son] was a baby in the cradle." The detail was also added that John McAnany had denied that the child was his. Probably the most direct testimony on behalf of appellant is that of Elizabeth McAnany Dunning, a daughter of John and Elizabeth McAnany and a sister of the decedent. She was about seventy-four years of age when she testified and was between eight and nine years old when she came to America with her brother James and her sister Mary in charge of her cousin James Murphy. This witness testified that her first knowledge of Patrick McAnany was when she saw him as a boy of sixteen or seventeen years standing on the steps of her father's home in Wilkes-Barre, at which time she was twelve or thirteen years of age and that Patrick seemed to be a year or so older than her oldest brother, James McAnany. Continuing, she testified that Patrick McAnany did not live with the McAnany family during the time she lived at home but that she left home when about sixteen years of age, her testimony reading: "Q. Was he [Patrick] recognized by your father or mother as your brother? A. No, sir. Q. Or by your brothers or sisters? A. Never heard of him. Q. How old were you when you left Nanticoke? A. Possibly about sixteen." Later in her testimony she replied to the question whether Patrick was her

brother, "No, no relation to me." On cross examination she stated that when she saw Patrick standing on the steps of her father's home the war was not quite over and he was wearing a uniform. It should be noted, as pointed out by the auditing judge in his opinion, that this witness was testifying with respect to incidents occurring and conditions existing about the time of the conclusion of the Civil War when she was a girl of about fifteen years of age and when, according to her statement on cross examination, she was going to school and too young to pay much attention to the war. Shortly after this she engaged in domestic service and two years later left Wilkes-Barre by reason of some estrangement with her family and did not return for a period of about twenty-three years. After a careful examination of all the evidence relied upon by the appellant we are of opinion that it does not amount to that "strong, direct and satisfactory proof" which is necessary to overcome the presumption of legitimacy, strengthened, as it is in this case, by the lapse of time. About all that can fairly be said with respect to it is that whenever the members of the McAnany family, and particularly the female members, discussed the subject of Patrick's parentage, it was agreed that the identity of his mother was shrouded in mystery, and it is apparent that the versions of the tradition relative to the time when, and the person by whom, he was brought to John McAnany's home in Ireland vary with the recollection of the narrator and the length of time which had elapsed since the event. The learned counsel for appellant cites and stresses Wharton's Estate, 218 Pa. 296. In that case the Supreme Court approved the statement of the auditing judge that legitimacy is based upon marriage and that it is only upon the presumption of marriage that legitimacy may be found, but, speaking particularly of the facts disclosed by the evidence in that case, said "The facts upon which to base

a doubt which appearing must and would be construed in favor of claimant are not present in this case.'' We are of opinion that facts are present in the case now at bar creating the kind of a doubt which must be construed in favor of the legitimacy of Patrick McAnany and the existence of these facts and circumstances to which we have referred in sufficient detail, taken in connection with the express acknowledgment of John Mc-Anany in the affidavit filed by him in the Pension Bureau, distinguish the case at bar from the case cited. The presumption of legitimacy is not to be shaken by a mere balancing of probabilities; the evidence to repel it must be strong, satisfactory and conclusive, and we are of opinion that the appellant has failed to produce such evidence in this case.

The assignments of error are overruled and the decree of the Orphans' Court of Luzerne County, dismissing exceptions to the report of audit and directing the accountants to make payment in accordance with the distribution made by that court, is affirmed at the costs of the estate.