## Thorn's Estate

660

Before Van Dusen, P. J., Sinkler, Klein, Bolger, Ladner, and Hunter, JJ.

672

674

*Leslie M. Swope, Robert W. Skinner,* and *Roland Flear,* for exceptants.

*Gilbert W. Oswald,* of *Schnader, Kenworthey, Segal & Lewis,* contra.

LADNER, J., July 13, 1945.—Of the 64 exceptions filed, exception nos. 3, 4, 5, 6, 7, 8, 9, 10, 14, 15, 16, 17, 20, 28, 29, 30, 31, 32, 33, 44, 45, 52, and 59 relate to the learned auditing judge's fact findings or refusal to make findings of fact on the evidence produced before him. The well-established principle governing the disposition of such exceptions is well stated by Judge Hunter in his Commonplace Book, vol. 2, p. 964, subdiv. 12 (*a*), to be as follows:

"Findings of fact by an auditing judge, like the verdict of a jury, will not be disturbed unless clear error be shown, and if there be sufficient evidence such findings will stand, even though another judge might have reached another and different conclusion. To justify a reversal there must be manifest error or the inferences and conclusions unwarranted." (See cases there cited and in the Cumulative Pocket Supplements attached thereto.)

The learned counsel for exceptants has not in his brief, nor at the argument, directed our attention to the evidence which he conceives to be insufficient to support the specific facts, nor the inferences therefrom found. Even if we do not regard this as an implied withdrawal of these particular exceptions, it is plain the duty of exceptants to convince us there was clear error in the auditing judge's findings has not been discharged. These exceptions are therefore dismissed.

Exceptions nos. 26 and 27 charge error in the action of the auditing judge in striking from the record

and refusing to admit in evidence a letter. These exceptions read:

"26. The learned auditing judge erred in ruling that letter (R. F. Ex. E.) was properly objected to, and that it be stricken from the record.

"27. The learned auditing judge erred in failing to admit the letter (R. F. Ex. E.) in evidence."

These exceptions are manifestly not self-sustaining and are in improper form. In Desiderio's Estate, 35 D. & C. 450, at page 451, we indicated the proper form exceptions of this character should take, and our reason for insisting on conformance therewith. We need not repeat what we there said. We dismiss these exceptions and do so with less regret after examining the letter and the reasons given by the learned auditing judge for his ruling as set forth in his adjudication which we approve.

Exception 51, which reads:

"51. The learned auditing judge erred in admitting testimony of claimants' mother to establish their acknowledgment by Bullock", is likewise in improper form. See Desiderio's Estate, supra. Nor do we find any merit in the same. It is, therefore, dismissed.

The rest of the exceptions are reflected in the three questions involved as set forth in exceptant's brief. These may be summarized as follows:

Exceptants being entitled under testator's will to take in default of issue of the deceased life tenant (Bullock) contend that the children of said life tenant were born illegitimately, and therefore not entitled to take, notwithstanding the subsequent marriage of their parents: (1) Because their father's divorce from his first wife was not validly obtained because of lack of jurisdiction and fraud, and (2) that even if the divorce was valid, the legitimation of the children after the death of the testator, George W. Thorn, was ineffective.

All of these contentions were resolved against exceptants. The auditing judge's comprehensive and learned adjudication so amply vindicates his rulings under the facts found by him that we can add little with profit thereto.

The issue here is not between Bullock, whose reprehensible conduct no one would justify, and his unfortunate deceased first wife. The issue is whether claimants are legitimate or illegitimate.

We observe that for sound reasons of public policy the presumption and charity of the law are in favor of legitimacy of every child, and whoever seeks to bastardize it, must establish the illegitimacy by proof that is clear, direct, satisfactory, and irrefragable. The presumption of legitimacy is not to be shaken by a mere balancing of probabilities: McAnany's Estate, 91 Pa. Superior Ct. 317. Under this beneficent principle, we feel the learned auditing judge was justified in not drawing any adverse inferences from the documentary evidence which he was not impelled to draw.

In the last analysis, the whole case of exceptants depends upon their contention that a fraud was committed by the deceased life tenant when he filed an affidavit in his divorce action to the effect that the residence of his wife was unknown. Exceptants contend this affidavit was false but, to establish the falsity, they must do more than show he should have known, or could have by reasonable diligence ascertained it. The letters and documents relied upon by exceptants to establish the fact of knowledge do not impel any such inference, and this was clearly demonstrated by the learned auditing judge whose convincing reasons we do not deem necessary to repeat. Since, therefore, exceptants failed to prove by satisfactory proof that the affidavit filed by the deceased life tenant was false, it serves no purpose to discuss whether or not the auditing judge was right in ruling in addition that even if the affidavit was false, the divorce decree could not

have been attacked collaterally *here* for such irregularity because the decisions of the State of Indiana forbid such a collateral attack *there*.

Apparently, under the most recent pronouncement of the United States Supreme Court in Williams et al. v. The State of North Carolina, decided May 21, 1945, not yet reported but appearing extenso in The Legal Intelligencer of May 24, 1945, the full faith and credit clause of the Federal Constitution requires the acceptance of a divorce decree so long as the court in which the decree was entered had jurisdiction of subject matter. Said the United States Supreme Court: "The domicile of one spouse within a state gives power to that state, we have held, to dissolve a marriage wheresoever contracted." But the domicile must be bona fide, and the bona fides of the domicile is open to challenge by a collateral attack in the court of another State, and should that court find as fact on sufficient evidence the residence was not bona fide, the decree ceases to have the protection of the "full faith and credit clause". In this case there is no proof nor even a pretense that the deceased life tenant, Bullock, was not a bona fide resident of the State of Indiana in which he commenced his action in divorce. He had lived there and was employed there years before the commencement of his divorce action. He continued to live there afterwards and until his death. In this aspect the case before us is far different from Commonwealth ex rel. Esenwein v. Esenwein, 348 Pa. 455, affirmed by the United States Supreme Court on May 21, 1945 (not yet reported), and the Williams case, supra, where libellants went to Nevada, remained only long enough to establish the six-week's residence required by the law of that State, left after the completion of the proceedings and decree was obtained, and then returned to their former domiciles.

We are inclined to think that the auditing judge was right in holding that matters of service of process

cannot be inquired into by a foreign State where the State decreeing the divorce has acquired jurisdiction by a bona fide residence of one spouse, but as previously indicated, since the falsity of the affidavit was not established, it is unnecessary now to discuss that proposition.

The other question raised by the exceptions is, whether the legitimation of the life tenant's issue, after the original testator's death, entitled such issue to take? We agree with the auditing judge in his ruling that the deceased life tenant's children having been legitimated by the law of Indiana, the State of their father's domicile, their status as such must be given recognition in every other State. See A. L. I. Restatement of Conflict of Laws §§140, 141, a principle recognized in our own court in Moretti's Estate, 16 D. &. C. 715. We also agree that, under the law of this State, children who are legitimated by a subsequent marriage are entitled to take under the bequest to issue where they are legitimated at the time the bequest becomes operative: McCausland's Estate, 213 Pa. 189 (1906); Schumacher's Estate, 41 D. & C. 100; Miller's Appeal, 52 Pa. 113. Exceptants rely much on Foster's Estate, 39 Montg. 109 as holding to the contrary, but that case was decided upon the language of section 15 (d) of the Intestate Act of June 7, 1917, P. L. 429, and applies to intestates only. The applicable law to this case is the Act of May 14, 1857, P. L. 507, sec. 1, 48 PS §167, which reads: "In any and every case where the father and the mother of an illegitimate child or children shall enter into the bonds of lawful wedlock and cohabit, such child or children shall thereby become legitimated and enjoy all the rights and privileges as if they had been born during the wedlock of their parents".

All the exceptions are dismissed and the adjudication is now confirmed absolutely.

BOLGER, J., dissenting.—The error in the adjudication and in the majority opinion arises from a blind

adherence to the legal presumption of legitimacy, which has only limited application to this case and which in fact is conclusively overcome by the unquestioned record facts. In this connection too much emphasis is placed upon whether or not the Indiana divorce proceedings and alleged remarriage are valid under Indiana law. The real question is whether such divorce and remarriage are binding upon the substitutionary beneficiaries under testator's will which is now before this court for interpretation. As the forum, it is our duty to decide whether the Indiana divorce decree meets "the tests of justice and fair dealing that are embodied in the historic phrase, 'due process of law' ": Frankfurter, J., in Williams et al. v. North Carolina, 317 U. S. 287, 306.

The issue before the court does not lie between Anna Hooley Bullock and the illegitimate children of her husband by Margaret Naomi Omlor, but is actually between the substitutionary beneficiaries of a portion of the residuary estate under testator's will and the Omlor children. Therefore, any technical defects in the Indiana proceedings attributable to Anna Hooley Bullock do not finally determine the devolution of property under testator's will.

George Anderson Bullock, Jr., absconded from Philadelphia in 1903 with his secretary after stealing $2,600 from the Fidelity Trust Company for which offense he was indicted. He left behind him his wife and child. He lived in adultery with his secretary and with her sister severally and collectively at times in several different cities in the middle west until after his wife's death in 1938 and by them had 12 children. The auditing judge has found the survivors of the nine children by Margaret Naomi Omlor, the secretary's sister, to be the legitimated issue of Bullock and therefore of his mother and consequently entitled to a share in this estate. After his mother's death in 1926, Bullock returned here to administer her estate and for one month

resumed marital relations with his wife, Anna Hooley Bullock. He then returned west without providing for his wife and despite a written pathetic plea, he refused to support her. Driven to desperation, his wife obtained a warrant of seizure in the quarter sessions court of this county and at a hearing where Bullock was represented by counsel, she was awarded the sum of $2,400 a year. In another equity proceeding in 1929, she was awarded against the spendthrift trust the sum of $10,000. After the exhaustion of this fund in 1938 Anna Hooley Bullock committed suicide at Cape May, N. J., at the age of 68 years. Her occupation was given as housework.

Exceptants, the substitutionary beneficiaries referred to, have never had an opportunity to appear and to contest the legality of George Anderson Bullock's divorce from Anna Hooley Bullock or to attack the alleged marriage between Bullock and Margaret Naomi Omlor. They maintain they are entitled to their day in court and unless they can now attack the Indiana decree of divorce collaterally and the validity of the marriage, in this proceeding, they will be deprived of due process of law. I agree with their position: Grossman's Estate (No. 1), 263 Pa. 139. In Vetter's Estate, 308 Pa. 447, our Supreme Court held (p. 452) :

". . . where some preëxisting right of theirs would be prejudiced if the judgment is given 'full faith and credit,' strangers are then permitted to set up fraud and collusion in the procurement of that judgment."

See also Adams v. Adams et al., 154 Mass. 290, 297, 28 N. E. 260 (1891), where the validity of a California decree of divorce involved an issue between legitimate issue in Massachusetts and an illegitimate child in California, it was held that the father's ". . . divorce was void and ineffectual as against his legitimate children, and that therefore his marriage with the plaintiff's mother was void, and did not legitimate the plaintiff *in such a sense* as to entitle him to set up a claim

in competition with the legitimate children under a Massachusetts will." (Italics supplied.)

Exceptants were without standing to appear in the Indiana divorce proceeding and now to hold that they are bound by that decree would be palpably unjust. That the Indiana decree is subject to collateral attack is indisputable: Williams v. North Carolina, United States Supreme Court, May 21, 1945; Commonwealth ex rel. Esenwein v. Esenwein, 348 Pa. 455, affirmed by the Supreme Court of the United States; Melnick v. Melnick et al., 147 Pa. Superior Ct. 564; Commonwealth ex rel. Saunders v. Saunders, 155 Pa. Superior Ct. 393.

The majority opinion is in error in sustaining the finding of fact that Bullock did not know his wife's address when he so stated in his application for divorce. To utilize the presumption of legitimacy as the ground for thus closing one's eyes and reason to patent facts is error. It is a worthy thing to strive to legitimate children, but I believe we have a greater obligation in connection with the tragic fate of Bullock's devoted and innocent wife; more particularly we should sedulously avoid anything that would validate his recreant conduct of abandonment, adultery and thievery and fraud upon the courts, and thereby prejudice the property interests of persons under testator's Pennsylvania will. These are the greater social and legal implications of this case and are more consistent with good morals. In Commonwealth v. Custer, 145 Pa. Superior Ct. 535, the late President Judge Keller pointed out (pp. 539, 540) that the general rule is that a marriage, valid where contracted, is valid everywhere, but that there are three exceptions to it: (1) That the marriage is contrary to the positive statute of their domicile; (2) that it offended against the prevailing sense of good morals in their domicile, and (3) that it was a fraud on the government and the people of Pennsylvania. In my opinion the Indiana marriage

comes within at least two of these exceptions and should, therefore, be ignored. Furthermore, the authorities offered to support the presumption of legitimacy contain facts totally different from those in the instant case. In McAnany's Estate, 91 Pa. Superior Ct. 317, the legitimation of a child was sustained after 80 years. Here all of the essential facts are in the record except possibly the evidence obtainable from Bullock whose loose conduct was so equivocal he could probably add nothing of assistance; on the other hand, we are lacking the testimony of Anna Hooley Bullock which, of necessity, would be in favor of exceptants.

Bullock *legally* knew his wife's address. The circumstances clearly prove it and leave no reasonable doubt of it on a fair mind. In the Esenwein Estate, supra, and the Williams Case (No. 2), supra, both courts disbelieved and rejected libellant's declaration of domicile. See also Melnick v. Melnick et al., supra. A recital of the facts compels a finding contrary to that reached by the auditing judge. Bullock's acts speak more eloquently than his words. Here was a man whose background was checkered. After spending his wife's money and the $2,600 which he stole from a trust company, he absconded with his secretary and subsequently lived sometimes under an assumed name with her and her sister and by them had 12 illegitimate children. He did not reveal this in his divorce action. Bullock returned to Haverford for a month in 1926, less than two years before he instituted his action for divorce, and lived there with his legal wife. After returning to Indiana, he appeared by counsel in the warrant of seizure proceedings in our Municipal Court and attacked the proceedings on the ground that his wife lived in Cape May, N. J. If he did not know where she lived, how could he then attack this petition? The specific address appeared in the record of that case. Later he received from Anna Hooley Bullock a letter requesting support. This letter contained the Cape

May address, 17 Jackson Street. I feel obligated to accept the evidences of my senses rather than this wastrel's uncorroborated false self-serving declaration and from these facts find that he was lying and that he knew Mrs. Bullock's address. Furthermore, it has been held that notice to the attorney is notice to the client: Arnold v. Carroll, 83 Pa. Superior Ct. 308, 311 (1924) ; Patterson's Estate, 234 Pa. 128, 133 (1912). Indeed, the auditing judge himself states:

"No doubt Bullock could have ascertained the address of his wife by inquiry of his own attorney, who knew that address by virtue of his participation in the Municipal Court proceedings in 1928. It is doubtful whether Bullock did in fact make reasonable inquiry before stating that his wife's address was not known, since inquiry of his own attorney would apparently have revealed that information to him."

I would prefer also to allow the principle of law that a fact of a continuous nature is presumed to continue to exist: Nixon v. Nixon, 329 Pa. 256; Commonwealth v. Fragassa, 278 Pa. 1. Bullock definitely knew his wife's address three days before instituting the Indiana proceeding. This presumption applies to domicile, and therefore to residence: Commonwealth ex rel. Saunders v. Saunders, supra. He is, therefore, presumed to have continued to know the address when he started his suit. Other elements of concealment in the pattern of fraud, that is the studied attempt to avoid a trial on the merits, are that Mr. Dausman, who was Bullock's attorney of record and whose son married one of the Omlor daughters, was not a "disinterested person" as required by Indiana law to take the affidavit that Mrs. Bullock was not a resident of Indiana, the advertising of the notice in the Millersburg newspaper, a town of 500 population, and the failure to supply important data in the divorce petition.

The question is then projected, what effect does the falsity of the statement have upon the validity of the

proceeding insofar as its being entitled to full faith and credit in this case? It was fraudulent as to defendant and since it injuriously affected the property rights of these exceptants and of this testator, it is not entitled to full faith and credit. In Williams et al. v. North Carolina, 317 U. S. 287, it was held that a decree of divorce granted by Nevada must be respected elsewhere since Nevada's finding of domicile was not questioned though the other spouse had neither appeared nor been served with process in Nevada and though recognition of such divorce offended the policy of North Carolina. This decision expressly overruled Haddock v. Haddock, 201 U. S. 562. However, the Supreme Court in the first Williams case assumed three important things, two of which are not present in our case, and which therefore render that case not controlling: (1) The legality of the domicile of plaintiff (which is not an issue here); (2) respondent was served with process in accordance with the Nevada statute (the service here was not made in accordance with the Indiana law); and (3) there was no dispute that respondent had deserted libellant (here Bullock deserted his wife). Furthermore, in his concurring opinion, Justice Frankfurter said that there was no "fraud or sham" in the case. Our case reeks with fraud, which distinguishes it most emphatically from the first Williams case and which in good conscience should open the door to the broadest inquiry.

Following a retrial in North Carolina, Williams was again convicted, this time on the ground that his Nevada domicile was fraudulent and therefore the court did not have jurisdiction over the parties. Our highest court affirmed Williams v. North Carolina (No. 2), May 21, 1945, and held that North Carolina which was the forum had the authority to reject Nevada's finding of domicile and make its own finding in that respect, and therefore sustained the refusal of North Carolina to honor the Nevada decree. Identical conclusions were

reached in the Esenwein and Melnick cases, supra. We are the forum in this case and it is perfectly proper therefore for us to brand the Indiana decree as fraudulent insofar as (1) the failure to comply with the Indiana statute respecting service upon defendant, and (2) with respect to its finding of desertion. It cannot be gainsaid that if, under Pennsylvania law, a libellant were required to state the respondent's address, failure to do so would void the decree: Carey v. Carey, 121 Pa. Superior Ct. 251; Weiner v. Weiner, 91 Pa. Superior Ct. 77. Such conclusion would conform to the relevant "Federal standards of full faith and credit": Williams v. North Carolina (No. 2), supra. The finding of desertion by the Indiana Court is not binding upon the substitutionary beneficiaries under this testator's will because no court here or elsewhere could rightfully have made such finding in the face of the record of persistent adultery by Bullock. See Bowman's Estate, 301 Pa. 337 (1930). I believe that we have full authority to so conclude because the record in the Municipal Court of this county both before and after the Indiana decree, as well as the evidence given from the witness stand, clearly and convincingly demonstrates that Bullock played fast and loose with the courts as well as with his women, that in all decency and equity the record can and should be examined by this court to ascertain the real merit or lack of merit in his case: Duncan v. Duncan (No. 1), 265 Pa. 464; Heins' Estate, 22 Pa. Superior Ct. 31; Fyock's Estate, 135 Pa. 522. I would, therefore, hold that Indiana was without jurisdiction and refuse to give full faith and credit to its decree as well as to honor the alleged marriage.

Respecting the Indiana law which declares that decrees rendered in cases where the libellant falsely states that he does not know the defendant's address are voidable and not void, we are not bound by such law because we are the forum and can declare that

there was no obligation under the circumstances upon Anna Hooley Bullock to leave Pennsylvania and go to Indiana: Williams v. North Carolina (No. 2), supra. Respecting the provision of the Indiana law that in this case Anna Hooley Bullock had two years in which to attack the decree in Indiana and may never be charged with negligence or acquiescence in it because she did not attack it, I point to her prompt and effectual attack upon that decree in the Municipal Court. She was unquestionably advised, and correctly so, by her counsel that the Indiana decree was not effective; that she took all of such steps as were necessary under the Pennsylvania law to protect her rights.

Furthermore, and more important to this issue, the record of the Municipal Court equity proceeding not only reflects a tacit admission by Bullock that the Indiana divorce decree was not binding upon Anna Hooley Bullock, but that Mrs. Bullock proceeded with her action only for the purpose of obtaining support. In all probability the consent decree therein entered, which awarded the amount Mrs. Bullock sought, accomplished not only that result, but also protected the interests of the Omlor children in this estate because the consent decree amounted only to a contract between Bullock and Mrs. Bullock. It had no further binding effect. This constitutes the main reason why the substitutionary beneficiaries, who are the exceptants here, are now entitled to be given every consideration and why the Indiana proceedings do not meet the test of "justice and fair dealing that are embodied in the phrase 'due process of law'". I would therefore sustain the exceptions and declare the Indiana divorce not valid in the sense that it entitles the Omlor issue to be classed as issue of Annie Snare Bullock and entitled to her share in this estate.