Tomayko *v.* Carson, Appellant.

Argued March 22, 1951. Before DREW, C. J., STERN, STEARNE, JONES, BELL, LADNER and CHIDSEY, JJ.

*Charles C. Arensberg* and *Adolph L. Zeman,* with them *Patterson, Crawford, Arensberg & Dunn, Robert L. Zeman, Zeman & Zeman, Howard F. Carson* and *William S. Yard,* for executors and legatee, appellants.

*George B. Stegenga,* with him *Bloom, Bloom & Yard,* for legatee, appellant.

*Clarence O. Devore,* for appellee.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, October 3, 1951:

The question is whether the claimant, appellee, has established ownership to corporate stock which was in

the name of a decedent, and unendorsed, found after the death in a safe deposit box which was in the names of both decedent and claimant. The proof chiefly relied upon by claimant consists of declarations alleged to have been made by decedent that he had given the stock to claimant. The claim was presented to the orphans' court and, upon its own motion, was certified to the court of common pleas. A jury rendered a verdict in favor of claimant. Upon refusal of motions for new trial and judgment for defendants n.o.v., these appeals followed.

As we view the evidence, there are no disputed questions of fact to be determined by a jury. The question is whether claimant's evidence, regarded as true and most favorable to him, is sufficient *at law* to support his claim of ownership to the stock by *inter vivos* gift.

Samuel A. Swearingen, of Charleroi, Washington County, was the sole owner of 500 shares of the common stock of a corporation named the "Coca Cola Bottling Company of Charleroi, Pennsylvania." 498 shares were in the name of decedent, unendorsed; of the remaining two qualifying shares: one was in the name of claimant and the other in the name of Charles L. Phillips (an employe). Both shares, while unendorsed, were accompanied by attached options to decedent to purchase.

The stock was found in the safe deposit box above referred to, which also contained $112,680 in cash, decedent's gold coin collection, two ladies' rings, one gentleman's ring, one wrist watch, one diamond stick pin, United States Bonds, personal letters and papers of decedent and various shares of stock in different corporations.

Claimant, in his amended petition, claimed all of the contents of the safe deposit box, being 181-A of the National Bank of Charleroi and Trust Company.

During the proceedings he withdrew all claims except to the stock of the Coca Cola Bottling Company of Charleroi.

Alex A. Tomayko, the claimant, was decedent's faithful and efficient employe, in whom decedent reposed great confidence. On February 23, 1944, decedent made his will wherein he bequeathed claimant all his stock in the Coca Cola Bottling Company *of Charleroi.* (italics supplied) On May 17, 1945, decedent made a first codicil which has no effect upon this litigation. On August 10, 1946, decedent executed a second codicil wherein he revoked the bequest of the stock to claimant and provided: "I direct that my executors give to the Coca-Cola Company *of Pennsylvania* (italics supplied) the first opportunity to buy my stock in the Coca-Cola Bottling Company *of Charleroi* (italics supplied), Pennsylvania, at the fair and reasonable value of my said stock." A third codicil was executed on February 16, 1947, republishing the will but which did not change the testamentary provisions concerning the disposition of the stock. Decedent died June 24, 1948, and his will and codicils were duly probated July 13, 1948. Judge CARSON, a common pleas judge of Washington County, co-executor and sole trustee in the will, a close personal friend of decedent, testified concerning decedent's reason for the change in his will. It was that the Coca-Cola Bottling Company *of Charleroi* was the licensee of the Coca-Cola Company of *Pennsylvania.* Officials of the latter company learned in some undisclosed manner of decedent's bequest. They objected. As licensor they feared that the stock might "pass into hands that would not manage the business correctly and properly." They insisted that the licensor company be permitted to purchase the stock upon decedent's death at its fair value. Decedent did not oppose these wishes because of his fear that the license might be withdrawn, whereupon the stock would be

worthless. Decedent thereupon reluctantly agreed to change his will. The Chicago lawyer of the licensor company drafted a clause which was accepted by decedent and which was incorporated in the codicil prepared by decedent's friend Judge CARSON. When the Judge inquired of decedent whether there should be incorporated a clause bequeathing the *proceeds of sale* of the stock to claimant, decedent stated that he *"had already made arrangements that Alex would be taken care of."*

Against this evidence claimant relies upon (a) testimony of three witnesses, all of whom testified to general declarations made by decedent that he had given the stock to claimant and (b) the fact that the safe deposit box, wherein the stock was found, was in the joint names of decedent and claimant.

A claim of a gift *inter vivos* against the estate of the dead must be supported by clear and convincing evidence: *Leadenham's Estate,* 289 Pa. 216, 137 A. 247; *Snyderwine, Admrx. v. McGrath,* 343 Pa. 245, 22 A. 2d 644. In order to effectuate an *inter vivos* gift there must be evidence of an intention to make a gift and a *delivery,* actual or constructive, of a nature sufficient not only to *divest the donor* of all dominion over the property but also *invest the donee* with complete control over the subject matter of the gift: *Pyewell's Estate,* 334 Pa. 154, 5 A. 2d 123; *Rynier Estate,* 347 Pa. 471, 32 A. 2d 736. It is claimant's burden to prove by *clear and satisfactory evidence* that a gift in fact was made: *Sullivan v. Hess,* 241 Pa. 407, 88 A. 544; *Kata Estate,* 363 Pa. 539, 70 A. 2d 351; *Lochinger v. Hanlon,* 348 Pa. 29, 39, 33 A. 2d 1. Cf. *Campbell's Estate,* 61 D. & C. 19.

We have examined the testimony of claimant's witnesses with care. We agree with counsel for appellant that there is insufficient evidence establishing with necessary preciseness just when, where or under what cir-

cumstances such declarations were made, or *when such gift was in fact made.* The declarations relied upon are entirely too loose and vague to prove an *inter vivos* gift. Such declarations do not constitute clear and convincing evidence of an *inter vivos* gift.

James Naccarato, an employe of the company, testified, p. 63a: "Well, he told me that he had already given it to Alex and it was already in a safety deposit box with—he didn't tell me the exact figures but somewhere around $100,000.00 for a building and as long as I got along with him, my job was secure."

J. H. Waggoner, also an employe of the company, testified, p. 72a: "He had told me that he had already given the stock and money to Alex and it was in a safety deposit box in the bank and Alex had the key for it, and he gave him that in order to build a new plant."

Gerald A. Perella, a salesman of the Virginia Dare Extract Company, testified concerning the date of the alleged declarations. When questioned as to the time of the last conversation about the gift of the stock, the witness said it was, p. 96a: "Just a little before he died —a good many months—a few months before."

He also testified, p. 97a: "He told me on several occasions he had given the stock to Alex and had given him the key to the safety deposit box and that it was Alex's."

Plaintiff maintains that since three witnesses testified in the vague and loose language above recited that decedent stated that he had given the stock to plaintiff, the proof of delivery was established. Claimant relies upon the legal principle that when a donor declares that he has given a gift at a previous time, it is implied that delivery and every other formality necessary to create a complete gift has taken place. Counsel for appellee cites *Malone's Estate,* 38 Leg. Int. 393; *Jacques v. Fourthman,* 137 Pa. 428, 20 A. 802; *Kulp*

*v. March,* 181 Pa. 627, 37 A. 913; *Leitch v. Diamond National Bank of Pittsburgh,* 234 Pa. 557, 83 416; *Leadenham's Estate,* 289 Pa. 216, 137 A. 247; *Sherman v. Stoner,* 78 Pa. Superior Ct. 189; *Adams' Estate,* 139 Pa. Superior Ct. 512, 12 A. 2d 465. A careful examination of these cases will disclose that in each instance there was additional evidence of delivery or of surrounding circumstances reflecting a delivery. Declarations by the deceased donor did not stand alone. Thus in *Malone's Estate,* supra, in addition to the declaration, witnesses testified to having seen the policy in the donee's (wife's) possession; in *Jacques v. Fourthman,* supra, the notes were found in donee's possession after donor's decease; in *Kulp v. March,* supra, donor had executed a written assignment of insurance policy to donee (his wife) and policy and assignment were found in donor's safe in an envelope with the donee's (wife's) name endorsed thereon; in *Leitch v. Diamond National Bank of Pittsburgh,* supra, the donor (husband) rented a safe deposit box in his wife's name, in which he deposited bonds and gave his donee (wife) key to the box; and also had produced the list of the bonds which he said belonged to his wife; in *Leadenham's Estate,* supra, donor took bonds out of his own safe deposit box and placed them in a separate box giving the donee a key; in *Sherman v. Stoner,* supra, donor gave a valuable clock to donee and signed a written declaration affirming the gift; in *Adams' Estate,* supra, donor executed a written declaration that the bonds had been given by her to the donees (her daughters).

The fact that decedent and claimant had joint access to the safe deposit box is not evidence of a completed gift to the latter. A joint lease of a safe deposit box is not of itself sufficient to establish joint ownership of securities found therein which originally belonged to one of the lessees: *Wohleber's Estate,* 320 Pa. 83, 181 A. 479.

Considering the evidence as a whole, proof of the alleged *inter vivos* gift is not sufficiently clear and convincing. The testamentary provisions were made in order to avoid the possible withdrawal of the license by the company which would have rendered the stock worthless. Without additional proof, it is difficult to discern why decedent would by will grant the licensor corporation the right to purchase the stock but at the same time secretly make an *inter vivos* gift of it to claimant, which gift, if the apprehensions of the decedent were as well founded as he considered them, would be worthless. As the licensor corporation disapproved of a gift of the stock to claimant, it would be immaterial whether such alleged gift was testamentary or *inter vivos*. Under all the facts and circumstances in this case the gift was not clearly and sufficiently proven.

The judgment is reversed.

———

DISSENTING OPINION BY MR. JUSTICE JONES:

Under the testimony adduced, the jury's verdict established that the decedent declared upon a number of relevant occasions in the last year of his life that he *had* given to Alex Tomayko, the claimant, the Coca-Cola stock here in controversy. The majority opinion discards the donor's declarations in such regard as being "too loose and vague" and states that ". . . there is insufficient evidence establishing with necessary preciseness just *when, where or under what circumstances such declarations were made . . . .*" On the contrary, I suggest that the testimony does do just that and with particularity. Reference need be made to no more than

the testimony of James Naccarato, one of the three witnesses to the declarations.[1]

---

[1] James Naccarato testified as follows:

"Q. Mr. Naccarato, a year or so before the death of Mr. Swearingen, state whether or not you had a conversation with him about this Coca Cola stock?

"A. Yes, I did.

*    *    *    *    *    *    *    *    *    *

"Q. When was this conversation?

"A. In the spring of 1947, a year before I came to work for him steady.

"Q. And where did this conversation take place?

"A. At his home.

"Q. That is, at Mr. Swearingen's home?

"A. That is right.

"Q. And what did he tell you with reference to this Coca Cola Company stock?

"A. Well, he told me that he had already given it to Alex and it was already in a safety deposit box with—he didn't tell me the exact figures but somewhere around $100,000.00 for a building and as long as I got along with him, my job was secure.

"Q. Now, did he say anything about a key at that time?

"A. Yes, he told me not to mention it to anybody—

"Q. No, I asked you did he tell you anything about a key to the box?

"A. Yes.

"Q. What did he say about the key for the box?

"A. Well, he said Alex had the key to the safety deposit box.

"Q. What was the purpose of you going there at that time?

"A. Well, I was employed with the Pittsburgh Steel for fourteen years and in changing jobs, I wanted some security, not to lose that seniority.

MR. YARD: If the Court please, this is objected to as not being within the scope of the offer.

MR. DEVORE: We will withdraw the question.

"Q. Did you have any conversation with him later about this matter?

"A. Yes, just before I took the job.

"Q. When was that?

"A. I would say around March of 1948.

388

What the decedent told Naccarato was not mere idle or even casual talk. Naccarato was considering taking a steady job with the Coca-Cola Bottling Company of Charleroi and wanted some assurance as to the prospective permanency of the employment. He had worked for the Pittsburgh Steel Company for fourteen years and, before changing positions, he wanted, as his testimony discloses and the circumstances authenticate, some indication of security; he didn't want merely to lose his seniority rights with the steel company. It was in such relation that Swearingen told him that he had given his stock in the Coca-Cola Bottling Company of Charleroi to Alex (Tomayko) and that as long as Naccarato got along with Alex he would be secure in his position. The first time Swearingen told Naccarato that he had given Alex the stock was in the spring of 1947 and the last time was in March 1948, shortly before Naccarato accepted employment with the Charleroi company. Swearingen died three months later, on June 24, 1948. The decedent's like declarations, as testified to by the other two witnesses, were not earlier than 1947. The significance of the time of their utterance will appear later.

The testimony amply supports a finding that the decedent had declared his completed gift to Alex. The jury accredited the witnesses thereto, as was its right, and the trial judge who saw and heard them approved the finding. To ignore the factual implications of the

"Q. And what did he tell you at that time?

"A. He told me that as long as I got along with Alex, I had nothing to worry about.

"Q. And did he say anything about the stock or the money at that time? Answer yes or no.

"A. Yes.

"Q. And what did he say?

"A. He said that Alex was given the stock and that there wasn't anybody could take it off of him."

jury's verdict is an unwarranted judicial invasion of the appropriate fact-finding function. In reviewing the record now before us, we should therefore start with the established fact that the decedent declared at relevant times in 1947 and 1948 that he *had* given to Alex his stock in the Coca-Cola Bottling Company of Charleroi which was in a safe deposit box to which Alex had a key.

The rule has long been recognized and applied in this State that declarations by a donor that he has already consummated his gift imply as a matter of law, and are therefore competent evidence of the fact, that delivery and every other essential to the creation of a valid gift were performed.

In a well considered opinion by Judge PENROSE for the Orphans' Court of Philadelphia County in 1880 in *Malone's Estate*, 8 W.N.C. 179, 182, it was held that ". . . the delivery may be proved by the declarations of the donor, just as the gift itself may be; and when the donor declares that he *had given* at a previous time, and that the donee had then become the owner, it is implied that delivery, and indeed every other formality necessary to create a complete gift, had taken place. The law always presumes knowledge of its requirements." The learned jurist further stated (pp. 181-182) that "It is clearly shown by the American authorities, if not also by the English, that any act on the part of the owner of a chose in action, showing not only a present intention to transfer, but that he regarded himself as having carried such intention into effect, is sufficient, and that no written evidence of the transaction is required." This court affirmed per curiam (sub nom. *Malone's Appeal*, 38 Legal Intelligencer 303) ". . . on the opinion of the learned Judge of the court below . . . ."

The *Malone* case has since been quoted from with approval a number of times and has never been de-

parted from or qualified: see *Kulp v. March,* 181 Pa. 627, 633 et seq., 37 A. 913; *Leitch v. Diamond National Bank of Pittsburgh,* 234 Pa. 557, 567, 83 A. 416; *Sherman v. Stoner,* 78 Pa. Superior Ct. 189, 193.

In *Leadenham's Estate,* 289 Pa. 216, 222, 137 A. 247, ". . . seven well-known residents of Franklin, friends of the doctor [donor], testified to *conversations* in which he said, in effect, that he *had given* Mrs. Austin the stock certificates and placed them in a box in the Franklin Trust Company's vault, which he had rented for her" (Emphasis supplied). This court held that the question of a gift of the stock was for the jury. Indeed, a mere implication by an alleged donor that a gift has been executed is sufficient to make the meaning of the donor's words a matter for the jury's interpretation on the issue of a gift: see *Jacques v. Fourthman,* 137 Pa. 428, 432, 20 A. 802. There the following questions were asked and answered,—"What did the decedent mean when he said 'Julia, where are those notes I gave you?' Did he mean that he had given them to [her]? Certainly, the court cannot say, as a matter of law, that he did not. The word used was entirely appropriate to express the fact of a gift. The actual meaning of the declarant must be determined by the jury, and if they decided that a gift was meant, could they not lawfully do so?".

Nor is the integrity of an executed gift impaired in the slightest degree by the fact that the donor has access to the safe deposit box where the gift property is kept or, if shares of stock, that they continue to stand in his name. In *Pyewell's Estate,* 334 Pa. 154, 160, 5 A. 2d 123, Chief Justice (then Justice) DREW said for this court, "Since the gifts of the property in question were fully executed by the donor, neither the fact that she [the donor] had access to the safe where the property was kept nor her subsequent receipt of dividends on this stock would invalidate the transaction: *Kauf-*

*mann's Estate,* 281 Pa. 519; *Chapple's Estate,* [332 Pa. 168, 2 A. 2d 719]. . . . once the transaction is completed it is not necessary that the donee retain the property in her possession: 28 C.J. 641." See also *Packer v. Clemson,* 269 Pa. 1, 3, 112 A. 107, where the gift stock continued to stand in the name of the donor throughout his life and on which he received the dividends during that time.

The majority seek to distinguish the cases cited in support of the gift by saying that " . . . in each instance there was additional evidence [beyond the donor's declarations] of delivery or of surrounding circumstances reflecting a delivery.'' The fact is that in no instance does it appear that the donor's declaration of an already completed gift was not of itself sufficient to carry the case to the jury. Especially, in the *Malone* case, it is implicit in Judge PENROSE's opinion that, without the independent evidence of delivery, there mentioned, the donor's verbal acknowledgment of his executed gift was sufficient to take the case to the jury on the question of gift. The case of *Wohleber's Estate,* 320 Pa. 83, 181 A. 479, which the majority cite is not presently germane. No one disputes that "A joint lease of a safe deposit box is not of itself sufficient to establish joint ownership of securities found therein which originally belonged to one of the lessees." But, on the other hand, the fact that both Swearingen and Alex had rightful access to the deposit box, wherein the stock was located, does not operate to divest Alex of his right to the securities by virtue of the proven gift: see *Pyewell's Estate,* supra.

As against the finding of an executed gift, which the declarations of the donor support, the defendants point to the fact that, although the decedent by his last will of February 23, 1944, had bequeathed his stock in the Coca-Cola Bottling Company of Charleroi to Tomay-

ko,[2] by a codicil of August 10, 1946, he revoked that bequest and in lieu thereof directed his executors to give the Coca-Cola Company of Pennsylvania first opportunity to buy the stock at its fair and reasonable value. The evidence clearly shows that this testamentary change was made not because of any desire on Swearingen's part, but actually contrary to his wishes, at the urgent insistence (veritably a demand) of the Coca-Cola Company of Pennsylvania to which the Charleroi company was beholden for its distributing franchise. In fact, the attorney for the Pennsylvania company (or the parent Coca-Cola Company of Delaware) prepared a draft of the change in Swearingen's will with respect to his stock in the Charleroi company, which the Pennsylvania company required, and intended to come to Charleroi to have the codicil "re-written and the will re-executed so that they would have the right to buy the stock." Swearingen, fearful of losing his distributing franchise if he continued to refuse to make the change in his will required by the licensing company, gave in to its demand and executed the codicil. But, he contemporaneously confided to a friend that "Alex would be taken care of." And, it is undisputed that his kindly feeling and attitude toward Tomayko never underwent any change but endured undiminished to the day of the decedent's death. A significant thing is that the declarations of the decedent, as testified to, that he had given Alex the stock (which he was at liberty to do despite the codicil) were all made subsequent to the execution of the codicil of 1946 and its republication of February 16, 1947. It cannot, therefore, be said as a matter of law, on the basis of

---

[2] The bequest was to "Alex. A. Tomayko, who for many years has been a faithful servant and employe of the Coca Cola Bottling Company and has been of great help and assistance to me in the operation of the said company . . . ."

the testamentary writings, that the decedent did not in his lifetime give Tomayko the stock as he acknowledged he had. The question of the gift was still a matter for the jury to resolve.

I fail to understand how the trial court can possibly be convicted of error for refusing the defendants' motion for judgment n.o.v. Accordingly, I dissent.

Mr. Justice BELL and Mr. Justice CHIDSEY join in this dissent.