Kerwin Estate.

Argued April 2, 1952. Before DREW, C. J., STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

reargument refused June 24, 1952.

*Robert A. Jarvis,* with him *James J. Dillon, J. I. Simon* and *Beck, McGinnis & Jarvis,* for appellants in Nos. 10 and 11.

*John A. Metz, Jr.,* with him *Metz & Metz,* for appellants in No. 34.

*Paul C. Ruffennach,* for appellees.

OPINION BY MR. JUSTICE CHIDSEY, May 27, 1952:

The appeals in this case are from the final decree of the Orphans' Court of Allegheny County, sitting *en banc,* which affirmed the auditing judge in awarding to appellees in equal shares the balance for distribution in the Estate of Sarah F. Kerwin, deceased. Catherine E. Snyder and William E. Kerwin, appellees, claimed the balance for distribution as niece and nephew respectively of the decedent. Appellants Mary McGlinchey and Joseph McRory claimed the same as first cousins challenging the legitimacy of appellees as children of decedent's deceased brother, John Kerwin. Appellant Vincentian Home for Incurables claimed a portion of the personal estate under a parol trust al-

leged to have been created during the decedent's lifetime.

The opinion of the auditing judge fairly states the evidence presented on behalf of Catherine Snyder and William Kerwin, on one hand, and Joseph McRory and Mary McGlinchey on the other. We therefore adopt his exhaustive summary which is as follows:

"Sarah F. Kerwin, or Sadie Kerwin, the decedent, died unmarried, intestate, and without issue on December 9, 1948. She was the daughter of John Kerwin, who died in 1872, and Isabella Kerwin, who died on March 3, 1911. The decedent, Sarah F. Kerwin, had two brothers—John C. Kerwin, Jr., who died on December 16, 1897, and William, who died, unmarried and without issue, on April 23, 1925. John C. Kerwin, Jr., who died in 1897, left surviving him an alleged widow, Mary Eisenberg Kerwin, who died in 1945, and two children—Catherine E. Snyder, nee Kerwin, and William E. Kerwin, who are both living and are claimants in this proceeding. For many years John C. Kerwin, Jr., with his parents and brother and sister, resided on Sampson or Sampsonia Street in what was formerly called Allegheny, now part of Pittsburgh. Old city directories show that 'John Kerwin' lived at 35 Sampson Street, Allegheny, from 1893 through 1897. John C. Kerwin, Jr., hereafter referred to as John Kerwin, courted Mary Eisenberg prior to 1895. Mary Eisenberg resided with her parents at that time on Jefferson Street in Allegheny, now Pittsburgh. Jefferson Street, where the Eisenbergs lived, and Sampson or Sampsonia Street, where the Kerwins lived, are in the same neighborhood. Racial and religious differences between the Kerwin and Eisenberg families caused objections to the proposed marriage of John and Mary. In the latter part of 1895 these two young people came to the home of Mr. and Mrs. Millard R. McQuaid on

Spring Garden Avenue, on the North Side, Pittsburgh, and John Kerwin told Mrs. McQuaid that '. . . they was going to go over and do it up right, and asked me (Mrs. McQuaid) if they could stay at our place until they got settled . . . said they was . . . going to get married . . .'. John Kerwin and Mary Eisenberg then went away for about a week, after which time they returned to the McQuaid home. When they came back to the McQuaid residence they told the McQuaids they were married and they lived with the McQuaids for five or six months. After John Kerwin and Mary Eisenberg went away to get married, and returned, they went to the Eisenberg home where they told her brother, John W. Eisenberg, and her mother that they had gotten married. After living with the McQuaids for five or six months, John and Mary went to live in the district known as Woods Run, or Manchester, on the North Side Pittsburgh. A child, John Charles Kerwin, was born to John and Mary Kerwin on July 17, 1896. The birth certificate issued by the City of Pittsburgh, in evidence as Exhibit 'A', shows the name of the father of the child as John Chas. Kerwin and the mother's name as Mary Kerwin. It also shows that the child was born at '6 Woods Run Street, 11 Ward.' Mr. and Mrs. McQuaid testified that, at the request of John and Mary Kerwin, they went to their home in Woods Run, or Manchester, and took the baby to church, had him baptized, and brought him back to his home. John Kerwin, the child's father, attended the baptism. This testimony is corroborated by a Certificate of Baptism, in evidence as Exhibit 'B', issued by St. Francis Xavier Church, North Side, Pittsburgh, Pa., showing the baptism on December 20, 1896, of John Kerwin, who was born July 17, 1896. This certificate shows the name of the child's father as 'John Kerwin' and the 'Name of the Mother (Before Marriage)' as 'Mary Eisenberger'. This child, whose name is shown on the death

certificate as 'John Kirwins', died on July 2, 1899, and the death certificate issued by the City of Pittsburgh, in evidence as Exhibit 'C', lists the name of his father as 'John' and his mother as 'Mary'. The testimony establishes that Catherine E. Kerwin was born August 13, 1893. John Kerwin recognized her as his child and she was known in the community where John and Mary Kerwin lived as their child. The testimony is that John Kerwin and Mary Eisenberg went away to get married in the latter part of 1895. John Kerwin, the father of the claimants, was killed in a railroad accident on December 16, 1897, about two years after he and Mary Eisenberg told the McQuaids that they had been married. Thus the period in which they could have established a reputation of being husband and wife lasted only for two years and expired about fifty-two years prior to the hearings in this case. William E. Kerwin, one of the claimants in this case, was born three months after the death of his father, John Kerwin. Several disinterested, credible witnesses who lived in the same neighborhood as John Kerwin and Mary Eisenberg testified that, prior to the death of John in 1897, he and Mary had the reputation in the community and among their neighbors of being husband and wife; that Mary Eisenberg was known as Mrs. John Kerwin and that Mary's children were known by the name of Kerwin. On July 23, 1919, the Eisenberg homestead at 206 East Jefferson Street, Pittsburgh, Pa., was sold. One of the heirs signing the deed of conveyance is Mary Kerwin, identified in the testimony as the widow of John Kerwin. Mary Eisenberg was known as Mary Kerwin, widow of John, from the date of death of John Kerwin (1897) until her own death in 1945. The certified copy of the 1900 United States census, in evidence as Exhibit 'K', listed her as Mary Kerwin and showed that she was a widow who had been married for three years and was the mother of three

children, two of whom were living. The two children were listed on the said census records as 'Kate' and 'William' Kerwin. They always used the surname Kerwin. At the time of the 1900 census Mary Kerwin and her living children, Catherine and William, were living at the home of her father, Christ Eisenberg at 206 East Jefferson Street, Pittsburgh, Pa. There is no testimony that the claimants were ever known by the name Eisenberg. There is some evidence that John Kerwin and Mary Eisenberg did not live together in a continuing marital relationship. The directories for the City of Pittsburgh indicate that he lived at 35 Sampson St., Allegheny, from 1893 through 1897. Miss Ella Mangan, a neighbor of John Kerwin, stated that she never missed him from Sampsonia Street, and that he was not reputed to be married to Mary Eisenberg, and that he was buried from his mother's home on Sampson Street.[1] The records of the Coroner of Allegheny County, in connection with the accidental death of John Kerwin, contain an affidavit made on December 17, 1897, by William Kerwin, a brother of John Kerwin, which states that the said John Kerwin was single at the time of his death. The application for letters of administration on the estate of John Kerwin, executed by his sister, Sarah F. Kerwin, on December 21, 1897, shows that 'the said decedent left the following named widow or husband, heirs and next of kin, to wit: Isabella Kerwin, mother, William Kerwin, brother, and Sarah F. Kerwin, sister.' This applica-

---

[1] This witness signed an affidavit which stated that ". . . She has personally known Mr. William E. Kerwin and Mrs. Katherine Kerwin Snyder to be the lawful children of Mr. John Kerwin, deceased, brother of the late Sarah Kerwin, deceased, and does further state that she has personally known this fact since their birth." When confronted with this on cross-examination she said ". . . I know that they are his children and her children." (referring to John Kerwin and Mary).

tion is a record of the Register's Office of Allegheny County, Pa., at No. 711 of 1897. There is no record of administration or distribution in the said estate of John Kerwin. The 1900 census record, Exhibit 'K', hereinbefore referred to, lists 'Kate Kerwin' and 'William Kerwin' as 'niece' and 'nephew' of Christ Eisenberg (Mary Kerwin's father) rather than as his grandchildren, as they should have been listed if they were held out as Mary Kerwin's children by her family. The record of the Register of Wills of Allegheny County, in connection with the probate of the will of Christ Eisenberg on July 24, 1905, contains an affidavit by Katharina Eisenberg, Mary Kerwin's mother, naming the children of the decedent; she names her daughter as Mary Eisenberg, although she names other married daughters by their married names."

Appellants vigorously contend that appellees did not produce sufficient evidence to establish kinship. We disagree. Under the facts as found by the auditing judge, appellees presented sufficient proof that they were the daughter and son of John Kerwin. The testimony by numerous witnesses that John Kerwin recognized Catherine as his daughter, the census which shows that Mary Kerwin was a widow and the mother of three children two of whom were living and known as Kate and William, and the baptismal certificate for John and other evidence support the conclusion of kinship reached by the auditing judge.

The chief complaint of the appellant cousins is that the burden was placed upon them of proving that a common law marriage did not exist between the alleged parents of Catherine and William Kerwin. We are of the opinion that the reasoning of the court in *Mays' Estate*, 141 Pa. Superior Ct. 479, 15 A. 2d 569 (allocatur refused) which we approve and adopt, rules this case. In that case President Judge RHODES discussed at great length the effect of the presumption

of legitimacy and rejected the contention of the appellants here. The court there said, at p. 484: "Appellee's kinship to decedent having thus been shown, it was not incumbent upon him to go further to prove his legitimacy; it was for the appellants to disprove it, and that by proof that was clear, direct, satisfactory, and irrefragable. (Pickens' Estate, supra; McAnany's Estate, 91 Pa. Superior Ct. 317)." The court continues, p. 486: "It thereby appears that the presumption of legitimacy is in reality the presumption of the fact and of the validity of the marriage of the child's parents, once parentage is established." In meeting the very point raised by the appellants here the Superior Court said, p. 487: "The effect of the presumption of the present appellee's legitimacy was, therefore, *to place upon appellants the burden of disproof of the marriage of his mother and the decedent.*" (Emphasis supplied).

Appellants' able counsel attempts to distinguish *Mays' Estate,* supra, on the grounds that the claimants in that case produced a baptismal record and that here appellees did not (even though they did produce a baptismal record for their alleged deceased brother). A baptismal record or certificate certainly is valid and important proof of kinship but, in our opinion, not of itself determinative whether or not the presumption of legitimacy arises. The presumption of legitimacy becomes operative upon the proof of kinship whether such kinship is proved by a baptismal certificate, by the testimony of one who was present at the birth or, as in this case, by circumstantial evidence which satisfies the auditing judge.

For the position taken by them appellants rely upon *Craig's Estate,* 273 Pa. 530, 117 A. 221. That case contains these peculiar facts. The claimant and her mother previously made a claim against the estate, alleging that they were child and widow of the deceased. This claim was compromised. The master to whom the

claim in *Craig's Estate* was referred found that the claimant was not a legitimate child of the deceased and that there was a legal compromise of the claim of the alleged widow and child. The mother, since she was not making a claim in this action, was permitted to testify. The Court reviewed her testimony and decided that it, together with other evidence, affirmatively disproved a common law marriage. In discussing the presumption of legitimacy this Court did say, "The question is not as to the paternity of appellant. That is conceded. Counsel for appellant argues the question here is one of legitimacy and that the burden is on respondent to overcome the presumption of legitimacy by clear and satisfactory facts. In this case, however, the question of legitimacy depends solely upon whether a valid marriage existed between the parents of the child and the proof of this fact must measure up to the standard applied in such cases." It must be remembered that in *Craig's Estate* the person claiming to be the common law wife of the decedent testified in support of her daughter. The master thus had available a witness whose testimony had a direct bearing on whether or not a common law marriage had been consummated, which evidence, in turn, affected the question of legitimacy. In the instant case both parties to the alleged marriage are dead. The only evidence available is circumstantial. Kinship has been adequately established. Under such circumstances the holding in *Mays' Estate,* supra, is the correct rule to be applied rather than the above language in *Craig's Estate.*

In distinguishing *Craig's Estate,* and other cases, the Court in *Mays' Estate* said (quoting more fully from p. 487) : "The effect of the presumption of the present appellee's legitimacy was, therefore, to place upon appellants the burden of disproof of the marriage of his mother and the decedent. This burden they *might* have met in such a *conclusive* manner as to re-

quire appellee to rebut proof of his illegitimacy by any means at his command. This will, upon examination, be found to be the situation in which falls every case cited by appellees having to do with legitimacy of children rather than marriage merely." (Emphasis supplied). In the present case the lower court found, and in our opinion justifiably, that appellants did not sufficiently meet the burden of overcoming the presumption of appellees' legitimacy.

It is true that some of the language in *Wharton's Estate,* 218 Pa. 296, 67 A. 414, and *Fuller's Estate,* 250 Pa. 78, 95 A. 382, might indicate that the presumption of legitimacy arises only when children are born during wedlock, but none is a precise holding to that effect. All that these cases decide is that where all the evidence in the case affirmatively establishes that there was no marriage, the offspring of the union must be considered illegitimate. In so deciding, the Court in *Wharton's Estate,* supra, quoted with approval the statement by the auditing judge " '. . . that the facts upon which to base a doubt *which appearing, must and would be construed in favor. of claimant* are not present in this case . . .' ". (Emphasis supplied).

Whatever doubt as to the exact nature of the presumption of legitimacy might remain after a reading of the earlier cases is dispelled by more recent decisions of this Court. These recent cases are not confined to children born in the period of wedlock.

In *Thorn Estate,* 353 Pa. 603, 46 A. 2d 258, the issue was whether seven children of one George A. Bullock were entitled to an interest in the estate of George W. Thorn, and this depended solely upon their legitimacy. Although married to another woman, Bullock cohabited with one Margaret Omlor, and the seven claimants were the result of this meretricious relationship. Thereafter he obtained a divorce from his first wife and married Margaret Omlor. The claimants con-

tended they were legitimated by reason of that marriage. In rendering the unanimous opinion of this Court sustaining the divorce, Mr. Justice HORACE STERN said (p. 606) : "Our consideration of the case properly starts with a recognition of both the factual presumption that children are legitimate and the rule that, to overcome it, there is required clear, direct, satisfactory and irrefragable proof to the contrary: Senser v. Bower, 1 P. & W. 450; Thewlis's Estate, 217 Pa. 307, 66 A. 519; McAnany's Estate, 91 Pa. Superior Ct. 317; May's Estate, 141 Pa. Superior Ct. 479, 484, 15 A. 2d 569, 571."

In *Smith Estate,* 358 Pa. 616, 58 A. 2d 138, where there was a per curiam affirmance of the finding of the court below that the claimant was illegitimate, excerpts from the opinion of the court below which this Court adopted as its opinion, explicitly recognize the rule of *Mays' Estate,* but state that the testimony of illegitimacy was " '. . . clear, direct, satisfactory and irrefragable . . .' " and " '. . . fully rebuts the presumption of legitimacy.' ".

*Rosenberger Estate,* 362 Pa. 153, 65 A. 2d 377, was a dispute between two women, each of whom claimed to be the common law wife of decedent. In sustaining the validity of the first alleged marriage, Chief Justice MAXEY said for a unanimous Court (p. 160) : "The court was rightfully impressed with the fact that not to recognize the decedent's marriage with Grace would be to bastardize their child. The appellee relied upon the case of McAnany's Estate, 91 Pa. Superior Ct. 317, where the Superior Court in an opinion by Judge CUNNINGHAM, held that the presumption and charity of the law are in favor of the legitimacy of every child, and whoever seeks to bastardize it must establish its illegitimacy by proof that is clear, direct, satisfactory and irrefragable. In the case at bar there certainly is no such proof of the lack of marriage between de-

cedent and Grace as to stamp George C. Rosenberger, Jr., their child, as illegitimate."

The fact that the relationship was originally meretricious in the instant case adds nothing, nor does the fact that the niece, Catherine E. Snyder, was born to John Kerwin and Mary Kerwin before any marriage: *Thorn Estate*, supra; *Rosenberger Estate*, supra; Act of May 14, 1857, P. L. 507.

The remainder of the appellants' argument is concerned with an attempt to demonstrate that the testimony of appellees' witnesses was incredible. This was for decision by the auditing judge and his findings, supported by evidence which he believed and affirmed by the court *en banc*, will not be disturbed by this Court on appeal: *Mooney's Estate*, 328 Pa. 273, 194 A. 893; *Borden Trust*, 358 Pa. 138, 56 A. 2d 108.

The second aspect of this case concerns a parol trust allegedly created by the decedent in her lifetime. The sole testimony to support this trust was given by Miss Mary Brady, an intimate personal friend of the decedent who lived with her the last year of her life. This testimony reveals that sometime in January, 1948 Sarah Kerwin took Miss Brady to the North Side Branch of the Peoples First National Bank and Trust Company and made arrangements with the bank for Miss Brady to have access to her safe deposit box when decedent gave her the key; that at the same time decedent took three $10,000 U. S. Treasury 4¼ per cent. 1947-1952 bearer coupon bonds and some cash (the actual amount involved is $16,400) out of the box and placed it in her hands and when Miss Brady asked why the decedent did not put the money in the bank decedent told her her it "was all for charity" and named the charities; that in April, 1948 before decedent went to the hospital she told Miss Brady to go to the bank and take the bonds and the money out of the safe deposit box; that the next day when Miss Brady visited

her, decedent asked if she had complied with the request; that Miss Brady then went to the bank and obtained the bonds and money and returned home and placed them in a tin box in a cupboard in the decedent's home; that when decedent returned from the hospital in July, 1948 she told Miss Brady to get the tin box and took several one hundred dollar bills out of it to pay the hospital bills.[2]

Miss Brady also testified that decedent was going to take care of these charities in her will; that she never had possession of the money but was only to watch over it while it was in Miss Kerwin's home; that the money was kept in the tin box because it was "right there if she [the decedent] wanted to give it"; that she would not go to the tin box unless the decedent told her to go.

It is well established that to prove an oral trust the proof must be clear, precise and indubitable: *Danner et al. v. Danner*, 366 Pa. 178, 180, 77 A. 2d 217. The auditing judge here characterized Miss Brady's testimony as "highly equivocal". For this reason alone the decree should be affirmed.

However, there is an additional reason why the decree must be affirmed. "In order to effectuate an *inter vivos* gift there must be evidence of an intention to make a gift and a *delivery*, actual or constructive, of a nature sufficient not only to *divest the donor* of all dominion over the property but also *invest the donee*

---

[2] Miss Brady had previously signed two statements and gave testimony at the first hearing. In her testimony at the first hearing she did not mention going to the bank and being handed the bonds and cash. The signed statements also differed materially from her final testimony. In the statements the version of the use that the decedent made of the money in the box was that both the hospital bill of $1,000 and the doctor bill were paid from it, the money in the box was used for household expenses and rental income of the decedent was placed therein.

with complete control over the subject matter of the gift :" *Tomayko v. Carson,* 368 Pa. 379 (1951), 83 A. 2d 907. See also *Pyewell's Estate,* 334 Pa. 154, 5 A. 2d 123; *Rynier Estate,* 347 Pa. 471, 32 A. 2d 736. In the instant case the testimony of Miss Brady indicates that not only did Miss Kerwin not divest herself of all dominion over the subject matter but that it was kept in her house and on at least one occasion she used a portion of the money for personal expenses.

We therefore agree with the lower court that this claim was properly disallowed because (a) the evidence did not meet the quality test which has been established and (b) the decedent did not divest herself of dominion over the property.

Decree affirmed. Costs to be paid by appellants.

———

DISSENTING OPINION BY MR. JUSTICE BELL:

Sarah F. Kerwin died December 9, 1948, unmarried, intestate and without issue. Appellees, Catherine E. Kerwin Snyder, born August 13, *1893,* and William E. Kerwin, asserting they were respectively niece and nephew of decedent, claimed (against decedent's first cousins) the net balance of her estate. They based their claim on the theory that they are the *legitimate* children of decedent's deceased brother, John C. Kerwin, Jr., referred to in the majority opinion as John Kerwin, who they contend entered into a common law marriage with Mary Eisenberg, in the latter part of *1895.*

Appellees' claim stands or falls upon the questionable marriage of their father, John Kerwin, to their mother, Mary Eisenberg. Incidentally, Catherine, who was born more than 2 years, and begotten more than 3 years before the alleged marriage of her father and mother, admitted that in the 55 years of her life she

had never been in the decedent's home, although she lived only a few blocks away; that she had never called her "aunt"; that the decedent had spoken to her only once in her life; while William admitted that the decedent had never once spoken to him. When the decedent did not recognize these claimants as her niece and nephew it seems anomalous and very unfair that this Court should recognize them as such and award to them the decedent's estate.

There are 3 reasons, each of which is of itself sufficient, why the claim of Catherine and William Kerwin cannot be sustained—

1. The majority opinion ignores the principles, the spirit and the language of the opinions and the decisions of a host of cases of this Court which (on far stronger evidence) rejected such a claim. In order to reach its conclusion, the majority opinion is compelled to overrule the sound and long settled rule as to the burden of proof of legitimacy established in *Wharton's Estate*, 218 Pa. 296, 67 A. 414, and reiterated in *Fuller's Estate*, 250 Pa. 78, 95 A. 382, and in *Craig's Estate*, 273 Pa. 530, 117 A. 221; but even if this long established rule is now unwisely changed, the evidence is still inadequate to establish Catherine's and William's claim.

2. The record is barren of any evidence of a marriage ceremony or of an agreement of marriage in praesenti, but shows an original meretricious relationship. Moreover, the documentary evidence at or about the time of the alleged marriage, births and deaths, completely disproves marriage and is entitled to far greater weight than the 50 year old recollection of three "reputation" or "declaration" witnesses, plus an irregular cohabitation and a partial or divided reputation of marriage.

3. A relationship which was originally illicit or meretricious cannot under a score of decisions of this

162

Court ripen into a common law marriage without proof of a ceremonial marriage or an express agreement of marriage by words in praesenti—even a constant cohabitation and a general reputation of marriage would be insufficient: See *Pierce v. Pierce*, 355 Pa. 175, 49 A. 2d 346; *Stevenson's Estate*, 272 Pa. 291, 116 A. 162; *Rosenberger Estate*, 362 Pa. 153, 65 A. 2d 377; *Patterson's Estate*, 237 Pa. 24, 85 A. 75, and the many cases hereinafter cited. This important principle iterated and reiterated in this Court's opinions for 100 years, was not even considered or discussed by the majority opinion. Whatever may be the reason for such over-sight, there was no proof of such an agreement of marriage and without it, claimants cannot possibly prevail.

Marriage in Pennsylvania is a civil contract by which a man and woman take each other for husband and wife. There are two kinds of marriage: (a) ceremonial; (2) common law. A ceremonial marriage is a wedding or marriage performed by a religious or civil authority with the usual or customary ceremony or formalities. A common law marriage is a marriage by the express agreement of the parties, without ceremony and almost invariably without a witness, *by words* —not in futuro or in postea, but *in praesenti.* " 'Marriage in Pennsylvania is a civil contract and does not require any particular form of solemnization before officers of church or state, but is entered into by words *in the present tense,* uttered with a view and for the purpose of establishing the relation of husband and wife.' Fiedler v. National Tube Company, 161 Pa. Superior Ct. 155, 158, 53 A. 2d 821": *Rosenberger Estate*, 362 Pa. 153, 65 A. 2d 377. In exact accord are *Craig's Estate*, 273 Pa. 530, 117 A. 221; *Com. v. Stump*, 53 Pa. 132; *McGrath's Estate*, 319 Pa. 309, 179 A. 599.

Because it is often very difficult to prove a common law marriage by words in praesenti, the law has

created or raised under certain circumstances a presumption of marriage where two absolutely essential elements co-exist—cohabitation plus reputation. Cohabitation plus reputation are not marriage, they are merely circumstances which may give rise to a rebuttable presumption of marriage; but if it appears that there was no agreement of marriage *by words in praesenti* they are insufficient to establish marriage.

The law is, and for a century has been well established that "Cohabitation and reputation are circumstances which, when conjoined, may give rise to a presumption of marriage, but the cohabitation must be such as is consistent with and would naturally result from the marriage relation and the reputation must be general. *An irregular or inconstant cohabitation and a partial or divided reputation will not sustain a presumption of marriage"*: Patterson's Estate, 237 Pa. 24, 28, 85 A. 75. See also to the same effect: *Yardley's Estate,* 75 Pa. 207; *Appeal of Reading Fire Ins. & Trust Co.,* 113 Pa. 204, 6 A. 60; *Callery's Estate,* 226 Pa. 469, 75 A. 672; *Craig's Estate,* 273 Pa. 530, 117 A. 221; *Levy's Estate,* 307 Pa. 522, 161 A. 740; *Bicking's Appeal,* 2 Brewster 202; *Nikitka's Estate,* 346 Pa. 63, 29 A. 2d 521.

The principles established by these and a score of additional authorities, as well as the decisions themselves have been completely ignored by the majority opinion. In an attempt to get around these decisions, the majority opinion has been compelled to overrule our decisions in *Wharton's Estate,* 218 Pa., supra, *Fuller's Estate,* 250 Pa., supra, and *Craig's Estate,* 273 Pa., supra, and to substitute for them a principle which they erroneously assert was laid down in *Mays' Estate,* 141 Pa. Superior Ct. 479, 15 A. 2d 569, viz., a presumption of legitimacy arises instantly on the birth of a child without any evidence or proof of any marriage of his parents. Parenthetically, we may state that even if

such a rule or presumption of legitimacy could be applied in this case, it could not possibly avail to sustain, under the evidence, the claim of these appellees. But *Mays' Estate* never asserted the rule which the majority now adopt. The Superior Court in that opinion said: "In Fuller's Estate [250 Pa., supra] the evidence indisputably showed the relationship between the decedent and the mother of the children to have been illicit at its commencement, and on the presumption that it so continued it was held their duty to prove a marriage." In the instant case one of the claimants admits the original relationship of her parents was illicit and that she was born more than a year before their alleged common law marriage; consequently *Mays' Estate* not only fails to support the majority opinion, but recognizes the rule to be exactly the opposite to that which is asserted by the majority where, as here, the original relationship of the parents was illicit.

In *Craig's Estate,* 273 Pa., supra, a beloved child of Craig claimed her deceased father's share of the income of a trust estate. Her father had lived with her mother ostensibly as man and wife for over 40 years and had recognized their child, the claimant, all that time. Counsel for the child argued, just as do the claimants, in this case, that the relationship of father and daughter raised a presumption of legitimacy which those denying it had the burden of overcoming by clear evidence. *This Court* rejected this contention and held that the burden of proof of legitimacy was on the daughter, and said (p. 537) : "While the letters between Craig and appellant indicate the relationship of father and child, this adds little weight to the theory of the legitimacy of the child. The question is not as to the paternity of appellant. That is conceded. Counsel for appellant argues the question here is one of legitimacy and that the burden is on respondent to overcome the presumption of legitimacy by clear and satisfactory facts. *In*

*this case, however, the question of legitimacy depends solely upon whether a valid marriage existed between the parents of the child and the proof of this fact must measure up to the standard applied in such cases.  The real question for determination is whether appellant is the legitimate child of Hugh Craig, Jr., and this in turn must depend upon whether the parents were lawfully married.*"

It will be noted that this Court held that *the daughter of the decedent had the burden of proving legitimacy*; and that *the question of her legitimacy depended solely upon whether a valid marriage existed between her parents*; and that the marriage and legitimacy must be proved by evidence which measured up to the standard required in such claims.  This has always been the law of Pennsylvania and is certainly a salutary principle.  In *Fuller's Estate,* 250 Pa. 78, 95 A. 382, *decedent's children* petitioned for a citation to compel the administratrix to file her account, claiming that they were entitled to his estate on the ground that there had been a common law marriage between him and their mother.  This the Court refused and in its opinion said, (page 79) : "The relation between the mother of the appellants and William C. Fuller was illicit at its commencement, and the presumption is that it so continued: Hunt's App., 86 Pa. 294; Appeal of Reading Fire Insurance and Trust Company, 113 Pa. 204; Patterson's Est., 237 Pa. 24.  *The burden was upon the appellants to show the actual marriage of their mother to the decedent* whose estate they are claiming as heirs.  The court below properly found, under all the testimony, that *they had failed to prove a marriage, and their appeal must, therefore, be dismissed.*"

In *Wharton's Estate,* 218 Pa. 296, 67 A. 414, Edward Wharton, Jr., a son of Edward Wharton, claimed his uncle's estate, just as these claimants are attempting to claim their aunt's estate.  Edward Wharton stated

in his will that Edward Wharton, Jr. was his son. This Court held that that declaration, even in such a solemn instrument as a will, was not sufficient to establish the legitimacy of Edward Wharton, Jr. and said (page 298) : ". . . *legitimacy is based upon marriage—it is only upon the presumption of marriage that legitimacy may be found . . ."* The Court then held that the evidence was inadequate to prove a common law marriage of the parents of Edward Wharton, Jr.

In Hunter, Pennsylvania Orphans' Court Commonplace Book, Legitimacy and Illegitimates, Section 1 (e), p. 868, the law on this subject is succinctly stated as follows: *"Acknowledgment of parentage by father is insufficient without proof of marriage: . . ."*

These authorities demonstrate how unjustifiable, and the myriad decisions of this Court concerning common law marriages demonstrate how unwise the principle is which the majority opinion now seeks to establish viz., that there is a presumption of legitimacy of every child without proof of any marriage of her parents.

We pause sufficiently long to demonstrate how unwise and we believe disastrous to society it would be to overrule our prior time tested principles applicable to marriage and its off-spring, the legitimacy of children, and to substitute a presumption of legitimacy where there has been no marriage or evidence of marriage.

Judges, like all other people, are naturally concerned about the welfare of children and because of that fact a presumption of legitimacy has arisen in certain classes of cases, which meets with our hearty approval. There is a presumption of law that children are legitimate and proof to overcome this presumption must be clear, direct, convincing and irrefragable: *Cairgle v. American R. & S. S. Corp.*, 366 Pa. 249, 77 A. 2d 439; *Rosenberger Estate,* 362 Pa. 153, 160, 65 A. 2d 377; *Thorn*

*Estate,* 353 Pa. 603, 46 A. 2d 258. The majority opinion has failed to realize that this presumption of legitimacy has been confined to and has been applied by this Court only in those cases where the child was born in the period of wedlock—for example where its legitimacy was contested because of the non-access of the father, or because the mother was living in adultery, or because there was a prior marriage and a prior questionable divorce. Where a marriage has not been established, the presumption of legitimacy has never yet been applied by this Court, for to do so whenever and simply because the parents have a child, would often obliterate the necessity of marriage. It must not be forgotten that civilized society has believed for over 1,000 years that marriage is a holy estate instituted of God; it has been the foundation of the home and the family, and the bedrock upon which the legitimacy of children is founded. The wisdom and necessity of preserving this very important pillar of society is probably the reason why our Courts have always required an alleged common law marriage to "be established by clear and convincing evidence." *Pierce v. Pierce,* 355 Pa. 175, 49 A. 2d 346. In these days when honor, morality, ancient time tested principles and ideals, spiritual values, and even Religion itself, are crumbling from within, and being constantly attacked and undermined from without, it seems a shame that the holy institution of matrimony should likewise surely although unintentionally be weakened, by-passed and undermined. For these reasons it is very unwise, and in this case, as we shall see, absolutely unavailing, to overrule the many decisions of this Court which require clear and convincing proof of a marriage before one is entitled to claim the relationship of wife or the legitimacy of a child.

As Mr. Justice Patterson wisely said in *Nikitka's Estate,* 346 Pa. 63, 67, 29 A. 2d 521: "The law, of ne-

cessity, imposes a heavy burden on one who grounds his claim on an allegation of common-law marriage. As said by President Judge KELLER in Baker v. Mitchell, 143 Pa. Superior Ct. 50, 54: 'The law of Pennsylvania recognizes common-law marriages. But they are a fruitful source of perjury and fraud, and, in consequence, *they are to be tolerated, not encouraged*; the professed contract should be examined with great scrutiny, and it should plainly appear that there was an actual agreement entered into, then and there, to form the legal relation of husband and wife.' Especially is this true where one of the parties is dead and the claim so grounded is to share in the distribution of his estate."

But there is a very important fact which the majority have overlooked and which completely shatters the new presumption of legitimacy (which they have adopted and) which they say "becomes operative upon the proof of kinship"; and from this presumed legitimacy they then presume marriage. This not only creates an unwise presumption which is contrary to the long established rule laid down by the Court, but piles one presumption upon another. This new presumption is of course a rebuttable one and like all rebuttable presumptions, falls in the face of facts showing a situation or condition contrary to that which was presumed to exist. The claimants themselves proved that Catherine was born illegitimate,* thus rebutting and completely destroying the presumption upon which the majority base their decision sustaining the claim.

---

* It will be noted that the Act of May 14, 1857, P. L. 507, §1, legitimatizing illegitimate children upon the subsequent marriage of their parents was not referred to by the majority opinion, probably because the real issue turns upon the question of marriage and if the parents were married after Catherine's birth she would of course be legitimatized; but you cannot, as the majority have done, presume legitimacy from kinship and then presume marriage from the presumption of legitimacy and thus establish the right to inherit.

Turning now to the merits, and considering the case irrespective of the question of who has the burden of proof, the evidence in favor of marriage is, upon analysis, not nearly as strong as the evidence against marriage. Expressed in another way, the documentary evidence at the time of the alleged marriage, birth of children, and death of father and relatives, is entitled to greater weight than the 50 year old recollection of the claimants' witnesses.

We are all agreed that the credibility of the witnesses was a matter for the auditing Judge and his findings of fact, where they are based upon adequate evidence, are binding upon us. But the weight to be given to and the inferences or deductions from findings of fact can always properly be determined as well by an appellate Court as by a lower Court; and the determination of the law is always a matter for the appellate Court. *Payne v. Winters,* 366 Pa. 299, 77 A. 2d 407; *Barrett v. Heiner,* 367 Pa. 510, 515, 80 A. 2d 729; *Noonan Estate,* 361 Pa. 26, 63 A. 2d 80; *Blue Ridge Metal Mfg. Co. v. Proctor,* 327 Pa. 424, 194 A. 559. In *Payne v. Winters,* 366 Pa., supra, Mr. Justice CHIDSEY said (p. 301). "Conclusions of law deduced from findings of fact are always a subject of judicial review. Where the decision rests upon ultimate inferences and conclusions to be drawn, the appellate court is under a duty to make such determination: Noonan Estate, 361 Pa. 26, 30, 63 A. 2d 80."

What therefore is the evidence pro and con?

The claimant, Catherine E. Kerwin, now Snyder, was born August 13, 1893, which, as we have seen, was more than 2 years before the alleged marriage of her parents in the latter part of 1895. Moreover, contrary to what the majority opinion states about the presumption of legitimacy applying to all children, it must be obvious and clear to everyone that if Catherine was

John's child, she was at the time of her birth illegitimate.

John Kerwin and Mary Eisenberg lived in the same neighborhood in Pittsburgh. He was an Irish Catholic, she a German Protestant. Claimants' testimony discloses that for these reasons the Kerwin and Eisenberg families were opposed to their marriage. In the latter part of 1895, when it is fairly inferable they were about to have a second child, John and Mary came to the home of Mr. and Mrs. McQuaid in Pittsburgh. John had been living in his family's home and Mary in her family's home. Why they selected the McQuaids to be their confidants is not disclosed. At any rate, they asked Mrs. McQuaid if they could stay at the McQuaid home until they got settled and said they were going to get married. They then went away for a week, after which they came back to the McQuaid home, told them they were married, and lived with the McQuaids for 5 or 6 months. Since they could not live in a respectable home without at least a pretense of marriage, it is, we submit, obvious why they said they were married. Since the testimony of the McQuaid's and of Mary's brother is the crux of the evidence upon which the majority opinion relies to establish the marriage of Mary and John, it seems appropriate to examine it to see how substantial is the foundation of their claim of marriage. Mary E. McQuaid—Direct Examination: "Q. And what did they tell you? A. They told me—he told me they was going to go over and do it up right, and asked me if they could stay at our place until they got settled, and I said, 'Sure, come ahead.' Q. Did he say what he was going to do? A. No, he didn't. Said they was going to do it up right, going to get married, because he wanted to come back and stay at our place. Q. Did he say where he was going to get married? A. No, he did not." Mr. McQuaid testified on direct examination: "Q. What did they say? A. Said they

was going to go and do it up right. I didn't know what they were going to do, but they were going to have it done up right. Q. What do you mean? A. I think they went away to get married, as far as I know. Q. Did they tell you they were or not? A. They told me they were."

That is the testimony which was offered to prove a marriage by agreement of the parties by words in praesenti. Need we say that it appears to us a reed instead of a rock on which to establish marriage?

However, Mary's brother also testified that they told him and Mary's mother at his home that they had gotten married, although they did not say they had been married by any church or civil authority or by any ceremony or by any agreement, or give any circumstances or details as to the time, nature or place of the alleged marriage. Certainly there was not a scintilla of evidence of an agreement of marriage by words in praesenti. Since Mary was about to have her second child by John Kerwin, the reason for telling Mary's brother and mother they were married is not difficult to guess—it was to screen and give respectibility to their meretricious relationship. However, such a statement was, as we shall see, refuted by Mary's mother.

Mary's brother and the McQuaids testified that John Kerwin and Mary, living 5 or 6 months with the McQuaids, went to live in the district known as Woods Run or Manchester, on the North side of Pittsburgh. A child, John Charles Kerwin, was born to John and Mary on July 17, 1896. The birth certificate showed the name of the father of this child as John Charles Kerwin (not Jr.) and of the mother as Mary Kerwin. There was no evidence who gave the information for the birth certificate and it is certainly not uncommon for a mother of an illegitimate child to name him after his father. In any event, it merely proves parentage, not marriage.

The McQuaids also testified that they and John Kerwin attended the baptism of this child who was then called John Kerwin. The baptismal certificate shows the name of the child's father as John Kerwin and the name of the mother (before marriage) as Mary Eisenberger. The certificate purports to show the name of the parents but does not prove or purport to prove marriage. It is universally known that the Church baptizes legitimate and illegitimate children alike. When the child died July 2, 1899, the death certificate listed him as John Kerwins and his father as John and his mother as Mary.

John C. Kerwin, Jr., was killed in a railroad accident on December 16, 1897. William E. Kerwin, the other claimant in this case, was born three months after the death of his father. The two children were brought up as Catherine E. Kerwin and William E. Kerwin.

The auditing Judge found that three disinterested credible witnesses, "who lived in the same neighborhood as John Kerwin and Mary Eisenberg, testified that, prior to the death of John in 1897, he and Mary had the reputation in the community and among their neighbors of being husband and wife. . . ." These witnesses had never been in or visited the home in Woods Run or Manchester were John and Mary were supposed to live. One of these witnesses was 13 years of age at the time of John's death, another was 15 years of age, and the age of the third was not given. Mary, twenty to twenty-five years after John's death, claimed in an application for letters of administration and in a deed that she was Mary Kerwin. Since these are self-serving declarations occurring after John's death, they are entitled to little weight. In 1900 the United States Census listed her as Mary Kerwin, living at the home of her father, Christ Eisenberg, in Pittsburgh, and showed that she was a widow who had been married

for three years and was the mother of three children, two of whom were living.

Now, what was the countervailing evidence as shown by the documentary records, the written statements of the parties' parents, and the conduct of the parties themselves? The auditing Judge found, *"There is some evidence that John Kerwin and Mary Eisenberg did not live together in a continuing marital relationship.* The directories for the City of Pittsburgh indicate that he lived at 35 Sampson St., Allegheny, from 1893 through 1897. Miss Ella Mangan, a neighbor of John Kerwin, stated that she never missed him from Sampsonia Street, and that he was not reputed to be married to Mary Eisenberg,* and that he was buried from his mother's home on Sampson Street. The records of the Coroner of Allegheny County, in connection with the accidental death of John Kerwin, contain an affidavit made on December 17, 1897, by William Kerwin, a brother of John Kerwin, which states that the said John Kerwin was *single*** at the time of his death. The application for letters of administration on the estate of John Kerwin, executed by his sister, Sarah F. Kerwin, on December 21, 1897, shows that 'the said decedent left the following named widow or husband, heirs and next of kin, to wit: Isabella Kerwin, mother, William Kerwin, brother, and Sarah F. Kerwin, sister.' This application is a record of the Register's Office of Allegheny County, Pa., at No. 711 of 1897. . . . The 1900 census record, Exhibit 'K', hereinbefore referred to, lists 'Kate Kerwin' and 'William Kerwin' as 'niece' and 'nephew' of Christ Eisenberg (Mary Kerwin's father) *rather than as his grandchildren, as they should have been listed if they were held out as Mary Kerwin's*

---

* The witness made a somewhat contradictory statement as to whether they were his children or his lawful children.

** Italics throughout, ours.

174

*children by her family.* The record of the Register of Wills of Allegheny County, in connection with the probate of the will of Christ Eisenberg on July 24, 1905, contains an affidavit by Katharina Eisenberg, Mary Kerwin's mother, naming the children of the decedent; *she names her daughter as Mary Eisenberg, although she names other married daughters by their married names."*

In other words the City of Pittsburgh directories list John Kerwin as living at 35 Sampson Street, Allegheny, from 1893 through 1897, *during the entire period of his illicit relationship and alleged marriage.* His brother, not 50 years later, but at the time of John's death, filed with the Coroner an affidavit that John Kerwin was single at the time of his death. His sister, not 50 years later, but at the time of his death, signed under oath an application for letters of administration on his estate in which the heirs and next of kin were his mother, his sister, his brother, and *no widow.* One of appellees' witnesses admitted that the Kerwin family believed John and Mary were not married.

What did the Eisenberg family believe? The 1900 census record upon which claimants place much reliance, records these claimants not as grandchildren of Christ Eisenberg, Mary's father, but as Christ Eisenberg's niece and nephew. Finally, when Mary's father died, and his will was probated on July 24, 1905, his widow, Mary's mother, who according to Mary's brother knew all about the wedding, must have forgotten about it, for under oath she named Mary as Mary Eisenberg but named their other married daughters by their married names. Doesn't this shout louder, and isn't it entitled to far more weight, than the testimony of Mary's brother 50 years thereafter, that Mary had told him and her mother in the latter part of 1895 that she and John Kerwin had been married?

In addition to all this documentary evidence which was made during John Kerwin's life or around the time of his death and therefore at a time when there was no reason to fabricate or invent or be mistaken, it is clear as crystal that the Kerwin family and the Eisenberg family believed that John and Mary were not married. Furthermore, there is additional persuasive evidence against the marriage. One of the claimants' own witnesses testified that the parents of John Kerwin never recognized Mary as his wife and that her reputation as to whether or not she was his wife was divided. A close neighbor of the Kerwins who remembered the name of the undertaker who buried John Kerwin and the cemetery in which he was buried, testified that John Kerwin and Mary Eisenberg had the reputation of being single and that Mary Kerwin, with whom she was well acquainted, never assumed the name of Mary Kerwin until after John's burial.

There are other straws in the wind which were not referred to by the majority opinion. John Kerwin was buried from his mother's home, not from Mary's. If Mary was really John's wife wouldn't she sit in the first pew of the Church during his burial services, and if she was his mistress wouldn't she likely sit in the rear of the Church? Mary Eisenberg stood in the rear of the Church at John's funeral services, heavily veiled.

Moreover, John Kerwin left an estate of $800. If Mary, who was obviously in need of money, had been his wife and their children had been legitimate, how can one explain her failure to claim his estate?

We have heretofore discussed the necessity of a regular and constant cohabitation and a general reputation of marriage, both of which must exist in order to raise a presumption of marriage. The evidence in this case falls far short of either requisite. "As said in Commonwealth v. Stump, 53 Pa. 132, 136: 'Reputation and cohabitation at best are only presumptive proofs,

and where either of these grounds fail, the court should not allow the presumption of marriage to be built upon the other.' . . . 'The mere fact that they [the alleged contracting parties] were known to a few people as man and wife is not sufficient evidence to establish marriage. Proof of reputation for such purpose must be general and not confined to a few persons in the immediate neighborhood, as the relationship may be established merely for the purpose of deceiving others': Hilton's Estate, 263 Pa. 16, 19. See also Yardley's Estate, 75 Pa. 207, 212; Appeal of Reading Fire Ins. & Trust Co., supra, 207.": *Nikitka's Estate,* 346 Pa. 63, 29 A. 2d 521.

There was absolutely no proof of a constant cohabitation; in fact the evidence showed the exact opposite. *There was absolutely no proof that John and Mary cohabited together at Woods Run or Manchester or indeed at any place* except for 5 or 6 months at the McQuaid home while she was having her second child. The only testimony to support the supposed cohabitation at Woods Run or Manchester was the testimony of the McQuaids that one day when the young child, John, was to be baptized, they went to Mary's home and the father was there,—no evidence that he lived there regularly or irregularly, just that he was there that day. Obviously this is utterly inadequate to prove cohabitation as husband and wife. Not even Mary's brother, who was claimants' star witness, ever visited their supposed home, although one day he met them on the street and they asked him to come down and see them. This is very, very far from proving the essential requirement of a constant, regular cohabitation or indeed of proving any cohabitation as man and wife.

Entirely apart from all the prior decisions of this Court, or any presumption, or any principle of law, if that evidence is sufficient to prove and establish either a marriage, or legitimacy, then we might as well

abolish the institution of marriage as well as the distinction between wife and mistress and legitimate and illegitimate children. However, all the prior decisions of this Court negate this necessity.

*Not a scintilla of evidence was offered by the claimants to prove either a ceremonial marriage or a marriage by words in praesenti.* The utmost that could be asserted in their behalf is that their parents told the McQuaids and her brother that they had been married; and that they had an irregular cohabitation and a divided reputation. An analysis and review of our prior decisions will clearly demonstrate that such evidence is totally and utterly inadequate.

Not only the correct and sound principles of law but also a convincing answer to the arguments made in support of this claim are set forth in the opinion by Mr. Justice, later Chief Justice, FRAZER, in the leading case of *Craig's Estate,* 273 Pa. 530, 117 A. 221. Hugh Craig, Sr., left a will in which he directed that from the income of his trust estate, there should, upon the death of any of his children, be paid to the child of such deceased parent one-half of his deceased parent's share of the income. Hugh Craig, Jr., left an alleged widow and *a child, although only the latter presented a claim;* accordingly the alleged widow of Hugh Craig, Jr., was permitted to testify on behalf of her daughter. This Court held that the claim of the daughter had to be based upon the marriage of her parents; that she had the burden of proving this marriage before any presumption of legitimacy could arise; and the Court, although the evidence in favor of marriage was far, far stronger than in the instant case, rejected the claim. The Court, in its opinion said, inter alia, (pages 533-534) *"Marriage is a civil contract* and does not require a particular form of solemnization by church or state officials to make it valid; but as a contract *it must be evidenced by words in the present tense* uttered with

a view to establish the relation of husband and wife and should be proved by the signatures of the parties, if in writing, or by witnesses who were present when the contract was made: Com. v. Stump, 53 Pa. 132. But if such evidence is not available, the marriage may be established by proof of reputation and cohabitation, declarations and conduct of the parties and such other circumstances as usually accompany the marriage relation: Richard v. Brehm, 73 Pa. 140. Neither cohabitation nor reputation alone is sufficient, however. Both must co-exist when there is no proof of actual marriage and together they are evidence from which a presumption of marriage arises, which presumption is always open to rebuttal by proof that no marriage had, in fact, taken place: Richard v. Brehm, supra; Com. v. Haylow, 17 Pa. Superior Ct. 541. In considering the effect of evidence offered to prove marriage by cohabitation and reputation, it is necessary to bear in mind the following language [of Justice SHARSWOOD] in Bicking's App., 2 Brewst. 222 [1867] : 'If a man and woman live together as husband and wife, are reputed to be such by their acquaintances, are visited and recognized by the friends of both parties, attend together places of worship or of public amusement, call each other and are called by the same name, and educate and recognize their children as legitimate,—a marriage proved to have been solemnized in facie ecclesiae would not be more satisfactorily shown. On the other hand, a man may live with his kept mistress in such a way as to create a kind of repute of marriage among some persons; he may even, to gratify her, allow himself to be held out, and hold himself out to her friends and acquaintances, as her husband, may be a constant visitor, sleep, and often eat at her house, may recognize the fruit of the connection as his children, and manifest affection and tenderness towards them; yet the evidence may fall short of that which ought to satisfy the

mind that there was an actual agreement to form the lawful relation of husband and wife. *The conduct of the parties must be such that almost anyone acquainted with them would naturally infer that they bore that relation to each other* . . . . he took over the house and continued to maintain her there . . . . [page 535] He lived with his parents and was known as a bachelor and apparently took precautions to prevent his friends from suspecting the contrary, even addressing letters to his alleged wife in the name of Mrs. L. Scott. The proof of the marriage consisted of the following testimony of the alleged wife: 'Q. Now, what was said by your husband and you at that time? A. He said, "I don't want you to ever use your name again; this is your name; *you are my wife*; and I want you to thoroughly understand that"; and I agreed with him thoroughly. . . . Q. What brought up the subject of marriage, if you can recall? A. Well, the subject had been talked over before and *he said that he would marry me and he did . . .*' *She testified further that they entered upon their marriage relations from that time.* [page 536] Her testimony is supported by certain important facts which are undisputed and which are as follows: A child, the present appellant, was born in 1886 and entered in the official record of births and deaths *at his request* as Edith Craig, child of Hugh and Lizzie Craig, the return having been made by the attending physician. There is other evidence of acts on the part of Craig in recognition of the child as his own and in later years there was correspondence between them which recognized the existence of the relationship of parent and child. *In a neighborhood in which they lived, appellant's mother was known as Mrs. Craig* and while Mr. Craig was absent frequently there was nothing to indicate the parties were other than a respectable married couple. All this occurred while they resided at 1837 Mervine Street, Philadelphia, between

1882 and 1889. . . . During the later period from 1889 to 1913 when Craig died, the alleged wife lived in Washington with their daughter, the appellant. [Of course if they had been legally married for 7 years, the fact that they subsequently lived apart would not annul or vitiate the marriage.] During this period of twenty-four years . . . [page 537] the testimony relied upon is that of appellant and her mother and some thousands of letters [over 4,000] which passed between the latter and Craig. During this time he continued to reside in Philadelphia and visited them at Washington two or three times a month. . . . *While the letters between Craig and appellant indicate the relationship of father and child, this adds little weight to the theory of the legitimacy of the child. The question is not as to the paternity of appellant.* That is conceded. *Counsel for appellant argues the question here is one of legitimacy and that the burden is on respondent to overcome the presumption of legitimacy by clear and satisfactory facts.* In this case, however, the question of legitimacy depends solely upon whether a valid marriage existed between the parents of the child and the proof of this fact must measure up to the standard applied in such cases. The real question for determination is whether appellant is the legitimate child of Hugh Craig, Jr., and this in turn must depend upon whether the parents were lawfully married." How is it possible to sustain the present claim in the light of that decision?

In *Stevenson's Estate*, 272 Pa. 291, the testimony in favor of marriage was likewise far stronger than in the instant case, yet the claim of marriage was rejected. The pertinent facts appear from the following excerpts from the Court's opinion (page 293) : "Frequent jaunts from Youngstown were taken by them, some quite lengthy, and, as it was inconvenient under such circumstances to travel on a boat or live at hotels as

unmarried persons, they registered as man and wife; during these times, when necessity demanded, because a curious situation would be otherwise presented, Stevenson introduced claimant as Mrs. Stevenson. Business and no doubt pleasure required her repeated journeys to Pittsburgh, on such occasions very often staying over night with Stevenson at various hotels, of course as his wife. In 1911 Miss Bradley engaged in millinery business at Youngstown. This was arranged by Stevenson paying a large part if not all of the cost, and keeping the claimant supplied with money at all times while conducting this business. . . . Whether the Ohio arrangement was for claimant's benefit or to screen his acts, he knew where Miss Bradley was located at all times, visiting there nearly every Sunday. He presented her with jewelry, money in large sums and valuable shares of stock. . . . [p. 294] Claimant had inserted an item in the society column of a Youngstown newspaper to the effect that she was to be married to Stevenson March 20th, and, after a trip to Florida and other southern points, they would reside in Pittsburgh. . . . There appellant insisted on marriage. . . . '. . . Arch came across the room, took me in his arms, saying, "Nancie, as long as you live I would not give you up, I will not give you up as long as I live; . . . from to-night on I am going to give you my name and protect you; . . . *you are my wife,* I always considered you for years as such; . . . *from to-night on we are married,* . . . I will give you my name and protect you as long as I live. [p. 295] Now, . . . we are as near and dear to each other as it is possible for us to be, *from now on you are Mrs. Stevenson,*" and I was satisfied. Q. Did you agree to that? A. I did.' They continued the journey, living at hotels as man and wife, later returning to Pittsburgh. Claimant, in April, moved her furniture from Youngstown into an apartment house at Beechview, Pittsburgh; here Stevenson

paid the house bills, including rent. The parties were not introduced as husband and wife, except by relatives of claimant. She was known to tradespeople in that vicinity as his wife, but not to the people generally or any part of them, save as indicated. She had few guests except relatives; to these few she was known as Mrs. Stevenson. Later, when visiting Youngstown or her uncle, she was addressed by letter as Mrs. A. M. Stevenson. The reason for this is obvious,—it enabled them to continue the deception. . . . [p. 296] When it is attempted to establish marriage without the usual formalities, we should examine the professed contract with great scrutiny, and be entirely satisfied this solemn undertaking has been entered into by the voluntary assent of both parties. The mere fact decedent joined, ostensibly as husband of appellant, in the conveyance of a few lots in Youngstown, Ohio, where she had lived for some years prior to moving to Pittsburgh, is not conclusive on the question of marriage, nor would the additional facts in evidence work such results. . . . [p. 297] This act, like many others before and after the supposed marriage, was done for the purpose of deceiving the public and making their continued illegal relations easier. . . . but *where, as here, we have an admitted illicit course of conduct for many years before the alleged marital contract, marriage will not be presumed because of cohabitation and reputation without proof of a changed relation*: Yardley's Est., 75 Pa. 207, 211; Patterson's Est., 237 Pa. 24, 28; Hunt's App., 86 Pa. 294, 297; Grimm's Est., 131 Pa. 199, 202. . . . [p. 299] how could they live in a respectable community unless they passed among the people there as husband and wife? . . . After April, 1918, the decedent did address letters to claimant as Mrs. Stevenson, but these letters were sent to her when she was in Youngstown, where her friends supposed her to be married. Similarly addressed letters were written by him

to her when she was visiting in the home of her uncle. . . ."

To summarize, for 16 years Stevenson and Mrs. Stevenson lived together much of the time as husband and wife; they took many trips together and always registered as man and wife; Stevenson frequently introduced claimant as Mrs. Stevenson; he bought and paid for the home in which they lived, as well as for her business; he presented her with jewelry and large sums of money and valuable shares of stock; he told her that she was his wife and "from tonight on we are married"; she advertised that they were about to be married; she was known to tradespeople in the vicinity as his wife, as well as to all her relatives; he addressed her in countless letters as Mrs. A. M. Stevenson (which was his name) ; they joined together in the conveyance of real estate; yet in spite of all this evidence, her claim as a common law wife was rejected.

The evidence in *Stevenson's Estate,* in *Craig's Estate* and in many other decisions of the Supreme Court of Pennsylvania was far stronger in favor of marriage than in the instant case; yet in such cases the claim was rejected. In the light of those decisions of this Court, how is it possible to sustain the present claim?

But even if we blindly ignore all the evidence in favor of the contestants, and believe all the evidence in favor of the claimants, it is still impossible for them to recover. There is in this case an additional factor which the majority opinion has completely overlooked, but which according to *a host of decisions of this Court, presents an unsurmountable barrier to claimant's recovery,* namely, the original illicit or meretricious relationship of the parties.

Where the relationship between the parties was originally illicit or meretricious, the claimant must prove a changed relationship, to wit, an actual marriage; and evidence of reputation and cohabitation and of the

acts, conduct, declarations or admissions of the parties are insufficient without proof of an actual marriage: *Pierce v. Pierce*, 355 Pa. 175, 49 A. 2d 346; *Rosenberger Estate*, 362 Pa. 153, 65 A. 2d 377; *Stevenson's Estate*, 272 Pa. 291, 116 A. 162; *Patterson's Estate*, 237 Pa. 24, 85 A. 75; *Appeal of Reading Fire Ins. & Trust Co.*, 113 Pa. 204, 6 A. 60; *Hunt's Appeal*, 86 Pa. 294; *McLaughlin's Estate*, 314 Pa. 574, 172 A. 107; *Hughes Estate*, 98 Pa. Superior Ct. 328; *Bisbing's Estate*, 266 Pa. 529, 109 A. 670; *Edwards v. Enterprise Mfg. Co.*, 283 Pa. 420, 129 A. 449; *Commonwealth v. Phillips*, 83 Pa. Superior Ct. 213.

In *Pierce v. Pierce*, 355 Pa., supra, Joseph Pierce filed a bill in equity against Mamie Pierce for partition of real estate *held in their names as husband and wife*. The Court held that no valid common law marriage had been proved and directed partition. The relationship between the parties was meretricious at its inception, but on November 9, 1925, *the parties entered into a formal marriage contract* before the Clerk of the Orphans' Court of Fayette County. She believed that her former husband had died in 1923. Subsequently her first husband turned up and secured a divorce in 1927. Joseph Pierce and Mamie Pierce then lived together for 17 years as husband and wife; and likewise bore that reputation. After plaintiff learned in 1931 that defendant's first husband had obtained a divorce and so informed the defendant, he thereupon said, according to her testimony: "I will take you for my wife," to which she replied, "If that is the case I will take you for my husband." He denied this. This Court in its opinion said (page 179, 181) : "Cohabitation and reputation are not marriage. They are merely circumstances from which a marriage may be presumed. In McGrath's Estate, 319 Pa. 309, 315, 179 A. 599, 602, it was said: 'It is settled in this State, that, if other

proof is not available, "the marriage may be established," as was said in Craig's Est., [273 Pa. 530], at page 533, [117 A. 221, 222], "by proof of reputation and cohabitation, declarations and conduct of the parties and such other circumstances as usually accompany the marriage relation: Richard v. Brehm, 73 Pa. 140, [13 Am. Rep. 733]." . . .' A meretricious relationship once established, is presumed to continue. '. . . it can be converted into a valid and legal marriage, . . . only by the consent of both parties, *established by clear and convincing evidence*': Wagner v. Wagner, 152 Pa. Superior Ct. 4, 8, 30 A. 2d 659, 661. See McLaughlin's Estate, 314 Pa. 574, 578, 172 A. 107, 109; Wolford v. Whiterock Quarries, Inc., et al., 144 Pa. Superior Ct. 577, 579, 20 A. 2d 887, 889. The relation, being meretricious in its inception, no presumption of marriage is raised from proof of its continuance: McLaughlin's Estate, supra. . . . *Proof of reputation and cohabitation could not establish a marriage*; nor, in the absence of evidence regarding a marriage contract, is it sufficient to warrant a presumption of marital relations. *The presumption that the meretricious relations continued could be rebutted only by proof of a valid legal marriage.* . . . The burden, which the law imposes upon appellant, of establishing a change in the relations,—a marriage, by mutual consent, has not been sustained. The proof is insufficient to rebut the presumption of continuance of the original relationship. Assuming appellant's testimony, regarding their conversation in 1931, to be credible, ['I will take you for my wife,' to which she replied, 'If that is the case, I will take you for my husband'] she has, nevertheless, failed to establish a common law marriage contract. The words used were *in futuro,* not *in praesenti*: Craig's Estate, 273 Pa. 530, 533, 117 A. 221, 222; Hantz v. Sealy, 6 Binney 405, 409; Wolford v. Whiterock Quarries, Inc., et al., supra, 579; Baker v. Mitchell, et al., 143 Pa. Su-

perior Ct. 50, 54, 17 A. 2d 738; Fitzpatrick v. Miller, supra: Cline's Estate, 128 Pa. Superior Ct. 309, 311, 194 A. 222; Estate of Robert Murdock, 92 Pa. Superior Ct. 275."

In *Rosenberger Estate,* 362 Pa. 153, 65 A. 2d 377, Chief Justice MAXEY, speaking for the Court said (page 157) : "The court below rightly held that, 'The relationship between decedent and Grace was illicit in its inception and must be presumed to have continued so until a change in the relationship was affirmatively established. Hughes Estate, 98 Pa. Superior Ct. 328, 332 (1929). *The presumption of continuance of an illicit relationship can be rebutted only by proof of a valid legal marriage,* that is, a marriage by mutual consent, *effected* by words *in praesenti,* not *in futuro.*"

In *Hughes Estate,* 98 Pa. Superior Ct., supra, the Court speaking through Judge, later Justice LINN, said (page 334, 335) : ". . . it is well established by decisions that when the relation between parties had been illicit and meretricious at its inception, a marriage will not be presumed from the facts of cohabitation and reputation alone: *there must be proof of marriage;* among such decisions are Patterson's Est., 237 Pa. 24, 28; Fuller's Est., 250 Pa. 78, 79; Stevenson's Est., 272 Pa. 291; McDevitt's Est., 280 Pa. 50, 52; Com. v. Phillips, 83 Pa. Superior Ct. 213, 215."

In *Patterson's Estate,* 237 Pa. 24, 85 A. 75, this Court, speaking through Chief Justice FELL, said, (page 28), "Cohabitation and reputation are circumstances which, when conjoined, may give rise to a presumption of marriage, but the cohabitation must be such as is consistent with and would naturally result from the marriage relation and the reputation must be general. An irregular or inconstant cohabitation and a partial or divided reputation will not sustain a presumption of marriage. *Moreover, when, as in this case, the relation between the parties was illicit in its inception, a*

*marriage will not be presumed because of cohabitation
and reputation without proof of a change of the rela-
tion*: Yardley's Est., 75 Pa. 207; Hunt's Appeal, 86
Pa. 294; Grimm's Est., 131 Pa. 199."

Statements or declarations or admissions by a hus-
band that he and claimant were married, introduction
of her as his wife, registering as man and wife, letters
addressed by him to her under their married name,
joinder in deeds of real estate, recognition of paternity
of child—all these are competent evidence tending to
prove marriage; but where the evidence shows an ir-
regular cohabitation or a divided reputation, or where
the relationship was originally illicit or meretricious,
they utterly fail to prove either a ceremonial marriage
or an agreement of marriage by words in praesenti,
and are insufficient to establish marriage: *Stevenson's
Estate*, 272 Pa. 291, 116 A. 162; *Levy's Estate*, 307 Pa.
522, 161 A. 740; *Patterson's Estate*, 237 Pa. 24, 85 A.
75; *Pierce v. Pierce*, 355 Pa. 175, 49 A. 2d 346; *Appeal
of Reading Fire Ins. & Trust Co.*, 113 Pa. 204, 6 A.
60; *Nikitka's Estate*, 346 Pa. 63, 29 A. 2d 521; *Oster-
ling's Estate*, 323 Pa. 23, 185 A. 790; *Hunt's Appeal*,
86 Pa. 294; *Hughes Estate*, 98 Pa. Superior Ct. 328;
*Edwards v. Enterprise Mfg. Co.*, 283 Pa. 420, 129 A.
449; *McDevitt's Estate*, 280 Pa. 50, 124 A. 294; *Com-
monwealth v. Phillips*, 83 Pa. Superior Ct. 213; *Yard-
ley's Estate*, 75 Pa. 207; *Grimm's Estate*, 131 Pa. 199,
202, 18 A. 1061; *Bicking's Appeal*, 2 Brewster 202;
*Craig's Estate*, 273 Pa. 530, 117 A. 221.

The evidence tending to prove marriage in the pres-
ent case was far weaker than in most of the cases cited
in this opinion and a host of others which could be
cited in which the claim of marriage was rejected by
this Court. Only by ignoring a myriad of decisions of
this Court as to the evidence necessary to establish mar-
riage especially where the relationship was originally
meretricious; and in addition thereto only by over-

188

ruling our long established rule as to the burden of proof of legitimacy, is it possible to sustain the present claim. In the light of our prior decisions and the salutary principles announced therein for 100 years, the allowance of this claim is incomprehensible.

Mr. Justice MUSMANNO joins in this dissenting opinion.